**Stephen C. WHELCHEL, Petitioner,**

v.

**Tana WOOD, Respondent.**

**No. CS–95–500–RHW.**

United States District Court,
E.D. Washington.

Nov. 19, 1997.

Nancy Tenney and Stephen Hormel, Federal Defenders of Washington and Northern Idaho, Spokane, WA, for Petitioner.

Erin Moore, Assistant Attorney General, Olympia, WA, for Defendant.

## ORDER GRANTING PETITIONER'S MOTION FOR SUMMARY JUDGMENT AND PETITION FOR WRIT OF HABEAS CORPUS

WHALEY, District Judge.

The issue before the Court is whether Petitioner's murder conviction was the result of a fair trial.[1] After a full consideration of the parties' extensive written and oral submissions on the questions addressed in this order, the Court concludes constitutional errors at Petitioner's trial undermined the legitimacy of his conviction. Thus, Petitioner's request for a writ of habeas corpus shall be granted, and the State of Washington must either grant Petitioner a new trial or forfeit the right to hold him in custody.

The constitutional errors that infected Petitioner's trial involved the federal constitution's Confrontation Clause, which requires that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. This right of confron-

---

**1.** Petitioner was represented by Nancy Tenney, of the Federal Defenders of Eastern Washington and Idaho. Respondent was represented by Assistant Attorney General for the State of Washington Erin Moore.

tation is a fundamental precept of our legal tradition, with roots dating back to ancient Rome. As a protection against the once common practice of allowing individuals to be convicted on the basis of anonymous or ex parte affidavits, the ability to face one's accuser in open court has long been recognized as an important safeguard against the mistaken conviction of innocent persons. Ensuring that persons accused of crimes are afforded this right serves the truth-finding function of the jury trial process in a number of ways, including: 1) ensuring that testimony is given under an oath that impresses on witnesses the importance of their testimony and that they are subject to penalties for perjury should they give false testimony; 2) forcing witnesses to face the accused in person when they testify, making it more difficult to lie "to their face" and reducing the risk that the wrong person is convicted; 3) subjecting testimony to the truth-exposing rigors of cross-examination; and 4) allowing the jury to personally observe the witness's demeanor and other aspects of the testimony that may bear on its credibility. All of these benefits are lost, and the risk of erroneous conviction is increased, when witnesses are not required to testify at trial.

It is true, of course, that a defendant is entitled only to a fair trial, not one that is perfect. In this case, however, Petitioner was unable to confront not one, but three separate individuals who provided damaging testimony against him. Two of these witnesses had been charged with the very same crime as Petitioner and, thus, had a strong incentive to shift the blame for that murder to Petitioner. The third individual, the father of one of Petitioner's codefendants, had a similar incentive and provided testimony that helped to undermine Petitioner's claim that he was not present when the murder occurred.

Finally, this Court is not the first to conclude that Petitioner's right to confront his accusers was violated. On Petitioner's initial appeal, the Supreme Court of Washington determined that the admission of the testimony of Petitioner's codefendants violated the Confrontation Clause. Washington's supreme court also let stand a similar court of appeals ruling regarding the testimony of the father of Petitioner's codefendant. While this decision agrees that Petitioner's right of confrontation was violated, it comes to a different conclusion than that reached by the Washington courts on the question of whether these constitutional violations affected the jury's verdict. Because the Court concludes this testimony had a substantial and injurious effect on the jury's verdict, it also concludes that Petitioner's conviction was the product of an unfair trial. Thus, his petition must be granted and he must be awarded a writ of habeas corpus.

## I. BACKGROUND

The background of this case is described in detail in the Court's first summary judgment order. *See* Ct. Rec. 91 (entered November 26, 1996). Rather than repeat that discussion, the factual and procedural section (Section I) of that order is incorporated herein, as modified by the discussion below.

The Court's initial summary judgment order granted judgment to Respondent on 14 of the 18 grounds for relief presented by Petitioner. This order addresses the four remaining grounds for relief, which Petitioner and Respondent both have requested be decided as a matter of law based on the record before the Court. Also addressed in this order are Petitioner's contention that the Court's prior summary judgment order erroneously dismissed his other 14 grounds for relief and his request to amend his petition to add an additional claim. Because the Court's decision regarding Petitioner's remaining four grounds for relief is dispositive of this case, those claims are addressed first.

## II. SUMMARY JUDGMENT

Four of Petitioner's grounds for relief remain pending at this stage of this case. As alleged by Petitioner, those four grounds are:

1. The admission of codefendants' taped interrogation statements after codefendants (McKee; Flota) invoked their Fifth Amendment rights.

2. The admission of [the] videotaped deposition of George Flota;

. . . .

5. Trial court erred in not admitting relevant evidence [of] the crime, a blue blanket sequestered from the crime scene . . . .

. . . .

18. Accumulation of the errors—violation of due process under state and federal constitutions deprived petitioner of a fair trial.

Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Ct.Rec.2).

For the reasons described more fully below, the Court concludes that Petitioner's first and eighteenth grounds for relief are meritorious. Of the other two grounds for relief, the failure to admit the blue blanket offered by Petitioner at trial did not involve constitutional error, while the admission of George Flota's videotaped testimony involved constitutional error that does not, on its own, warrant granting Petitioner a writ of habeas corpus.

## A. Codefendants McKee's and Flota's Taped Statements

■■■ Petitioner contends that the admission at his trial of three taped statements given to law enforcement authorities by Jerry McKee and Jeffrey Flota violated the Confrontation Clause.[2] Violation of the right of confrontation is considered to be "trial error" since it "occurred during the presentation of the case to the jury and may [] therefore be quantitatively assessed in the context of other evidence presented to determine whether its admission was harmless." *Arizona v. Fulminante*, 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Reversal for trial error is not automatic. Instead, if a court finds that such a violation has occurred, the court must also determine whether the error was harmless. *Id.*, 499 U.S. at 308; *see also Lee v. Illinois*, 476 U.S. 530, 547, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (remanding case for determination of whether Confrontation Clause error was harmless). To prevail, therefore, Petitioner must show that admission of these taped

statements violated the Confrontation Clause, and their admission cannot have been harmless when considered in the context of his entire trial.

These conditions have been met in this case. In reaching this conclusion, the Court joins the Supreme Court of Washington, which determined on direct review that McKee's and Flota's statements were not sufficiently reliable to render their admission at trial permissible despite the denial of Petitioner's right of confrontation. *See State v. Whelchel*, 115 Wash.2d 708, 801 P.2d 948 (1990). The Court parts company with that court on the question of whether these violations were harmless and concludes that these statements had a substantial and injurious effect on the jury's verdict.

The discussion below details the analysis underlying these conclusions, following a brief summary of the facts relevant to this ground for relief.

### 1. Factual and procedural background

During the early morning hours of September 27, 1986, Emargo McKee (Ms. McKee) was murdered near the shore of Moses Lake in Grant County, Washington. Her body was hidden in nearby brush and was not discovered until 18 days later, on October 15, 1986.

The next day, October 16, 1986, the victim's husband, Jerry McKee ("McKee"), came to the Moses Lake Police Department to file a missing persons report on his wife. McKee was interviewed in the investigator's office of the Moses Lake Police Department by a Moses Lake police officer and a Grant County deputy sheriff. During that interview, McKee admitted that his wife was murdered and implicated the five people who were eventually tried for crimes relating to the murder: himself, Petitioner, Jeffrey Flota ("Flota"), Beth Massey ("Massey"), and Nancy Hughes ("Hughes"). Later that evening, Flota was arrested and made a post-arrest statement at the Moses Lake Police Department to the same Grant County depu-

---

**2.** Although the Sixth Amendment directly restrains only the actions of federal officials, the fair trial restrictions that it places on government officials extend to state officials through the Due

Process Clause of the Fourteenth Amendment to the United States Constitution. *Pointer v. Texas*, 380 U.S. 400, 403–405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

ty sheriff and an additional investigator from that office. On the next day, October 17, 1986, McKee made an additional post-arrest statement in Grant County jail to the Grant County deputy sheriff and another investigator from that office.

Extensive portions of the McKee and Flota statements were audiotaped. *See* Respondent's Exhibits 26–28 (transcribed statements of McKee and Flota). Both McKee and Flota admitted in their statements that they were present at Ms. McKee's murder and that they knew beforehand that she was going to be killed. Each also contended that Petitioner was the moving force behind the murder and that he inflicted the injuries that killed Ms. McKee.

McKee and Flota both refused to testify at Petitioner's trial, exercising their Fifth Amendment right not to incriminate themselves. A preliminary hearing was held to determine whether admission at trial of McKee's and Flota's taped statements would violate the Confrontation Clause. After hearing argument on this issue, the trial court ruled that the statements were sufficiently reliable to fall within the Confrontation Clause exception for trustworthy statements made by individuals who are legally unavailable to appear at trial. *See* Respondent's Exhibit Twenty–Four (Verbatim Report of the Proceedings; hereafter "Trial Record") at 205–221, 244–253.

Pursuant to this ruling, the audiotaped statements were played for the jury at trial.[3] *Id.* at 1161–62, 1167–68. Prior to the commencement of the jury's deliberations, the trial court instructed the jury to subject the testimony of alleged accomplices to "careful examination." Respondent's Exhibit 29 (Instruction No. 6). The court also told the jurors that they should act on such testimony with "great caution" and should not find Peti-

tioner guilty based on such testimony alone unless they were "satisfied beyond a reasonable doubt of its truth." *Id.*

### 2. Confrontation Clause Violation

#### a. Legal Standard

There is no dispute that the Confrontation Clause's requirement that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him" was not expressly complied with in this case. McKee's and Flota's taped statements were played for the jury at Petitioner's trial, and Petitioner had no opportunity to confront them at any point during his trial or its preliminary proceedings because they exercised their Fifth Amendment right not to be compelled to incriminate themselves.

■ Strict compliance with the confrontation requirement is not always required, however. Because the underlying reason for the right of confrontation is to help ensure the accuracy of incriminating trial testimony, statements made by individuals who are legally unavailable to testify at trial may be admitted where those statements are sufficiently reliable that confrontation at trial would be unlikely to enhance the testimony's accuracy. *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In this case, McKee and Flota both were legally unavailable because they exercised their Fifth Amendment right not to be compelled to incriminate themselves.[4] *See California v. Green,* 399 U.S. 149, 168 n. 17, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (defendant who invokes the Fifth Amendment right against compelled self-incrimination is unavailable for purposes of the Confrontation Clause). Thus, the question of whether McKee's and

---

**3.** The tapes that were played for the jury were edited versions of the interviews, not the entire interviews that have been submitted in transcribed form to this Court. The original versions of the edited tapes have not been preserved by Grant County or the State of Washington. For purposes of this case, the parties agree that the only portions of the interviews that were edited out of the tapes played for the jury were references to satanism and to the victim's pregnancy.

*See* Ct. Rec. 157 (stipulation regarding content of edited tapes).

**4.** Even if they were not legally unavailable, as Petitioner contends, the United States Supreme Court recently called into question the continuing applicability of this requirement outside of the context of statements made in prior judicial proceedings. *See White v. Illinois,* 502 U.S. 346, 353–55, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992).

Flota's statements were properly admitted hinges on their reliability.

There are two ways to meet the reliability requirement of the Confrontation Clause. The first involves statements that correspond to "firmly rooted hearsay exceptions." *Idaho v. Wright,* 497 U.S. 805, 815, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). This approach has not been advanced by Respondent, and it remains an open question in the Ninth Circuit whether the hearsay exception under which these statements were admitted—declarations against penal interest—constitutes a firmly rooted exception.[5] *United States v. Nazemian,* 948 F.2d 522, 530 (9th Cir.1991); *see also Williamson v. United States,* 512 U.S. 594, 605, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (declining to reach issue). Instead, Respondent contends McKee's and Flota's statements satisfy the second means of meeting the reliability requirement because they are possessed of "particularized guarantees of trustworthiness." *Wright,* 497 U.S. at 815.

■ The "particularized guarantees of trustworthiness" inquiry is a totality of the circumstances test that balances factors relevant to the statements' trustworthiness. *Id.,* 497 U.S. at 819. This inquiry does not begin with a clean slate when the statements at issue are self-inculpatory statements by codefendants that also inculpate the defendant at issue. Instead, such statements are "presumptively unreliable." *Lee v. Illinois,* 476 U.S. 530, 539, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); *see also Bruton v. United States,* 391 U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Thus, at Petitioner's trial, the State was required to demonstrate that McKee's and Flota's statements regarding Petitioner's role in the murder of Ms. McKee were possessed of particularized guarantees of trustworthiness that were strong enough to overcome this presumption of unreliability. *Lee,* 476 U.S. at 539. In considering this question, this Court acts de novo, giving no deference to the legal conclusions of the state courts that have preceded it.[6] *Webb v. Lewis,* 44 F.3d 1387, 1392 (9th Cir.1994).

■ Although the trustworthiness inquiry is a totality of the circumstances test, there are limits on the circumstances that a court may consider. As the Supreme Court recently explained:

> We agree that "particularized guarantees of trustworthiness" must be shown from the totality of the circumstances, but we think the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief.

*Wright,* 497 U.S. at 819. Thus, a court cannot look to factors unrelated to the nature of the declarant and to the circumstances in which the statement was made, factors such as whether extrinsic evidence relating to the crime corroborates the accuracy of the challenged statement.[7] *Id.* at 823 ("we think the presence of corroborating evidence more appropriately indicates that any error in admit-

---

5. Respondent also has not argued that these statements satisfy the requirements of the declarations against penal interest hearsay exception.

6. Although the Antiterrorism and Effective Death Penalty Act of 1996 requires that federal courts give greater deference to the legal conclusions of state courts on collateral review, that requirement does not apply here because Petitioner's action was filed before the effective date of that act. *Lindh v. Murphy,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Robbins v. Smith,* 125 F.3d 831 (9th Cir.1997).

7. The trial court's decision that these statements were reliable was in large part predicated on its conclusion that the contents of these statements were corroborated by evidence unrelated to the circumstances surrounding their making. In fairness to the trial court, it should be noted that at the time it made this decision, it had not yet

been definitively established that corroborating evidence was an impermissible consideration. *See, e.g., United States v. Layton,* 855 F.2d 1388, 1405 (9th Cir.1988) (listing, *inter alia,* whether a statement was corroborated as a relevant factor in assessing the reliability of extrajudicial statements). While subsequent changes in the law generally are not a proper basis for federal collateral attack of a state conviction, *see Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), Respondent has not argued that position. Moreover, the fact that the Supreme Court upheld the reversal of the conviction of the defendant in *Wright* suggests that *Teague's* nonretroactivity principle would not apply in this case. *See also Webb,* 44 F.3d at 1387 (Supreme Court's analysis of guarantees of trustworthiness prong in *Wright* applied existing precedents rather than create a new rule).

ting the statement might be harmless, rather than that any basis exists for presuming the declarant to be trustworthy"); *Webb,* 44 F.3d at 1392 ("*Wright* forbids recourse to other evidence to corroborate the trustworthiness of the hearsay offered").

 Within this framework, the factors relevant to a statement's trustworthiness are context dependent; there is no definitive, exhaustive list of factors that applies across the wide variety of contexts to which this test applies. In the context of declarations against penal interest, however, the United States Court of Appeals for the Ninth Circuit has described a non-exclusive list of questions that generally are relevant to assessing the trustworthiness of such statements. These include:

1. Was the statement made voluntarily?

2. Was the statement made contemporaneously with the occurrence of the events it references?

3. Did the declarant admit that he committed acts contrary to his penal interest or likely to bring him into disrepute?

. . . .

5. Did the declarant have personal knowledge of the matters addressed in the statement?

6. Was the statement uttered spontaneously?

7. Was the person to whom the statement was made someone to whom the declarant would likely speak truthfully?

*United States v. Layton,* 855 F.2d 1388, 1405 (9th Cir.1988) (citations and reference to extrinsic corroborating evidence omitted), *overruled on different grounds, People of the Territory of Guam v. Ignacio,* 10 F.3d 608 612 (9th Cir.1993). Other Supreme Court and Ninth Circuit cases indicate that relevant factors may also include: 1) whether the individual had a motive to lie or shift blame; *Wright,* 497 U.S. at 821–22; 2) whether the statement was genuinely self-inculpatory, *Williamson,* 512 U.S. at 605; 3) the extent to which the statement was subjected to contemporaneous cross-examination or its equivalent; *Lee,* 476 U.S. at 544; and 4) the declarant's mental state at the time the statement was made, *Wright,* 497 U.S. at 821.

Because neither the parties nor the Court have identified additional factors relevant to this particular case, this general list of factors has been adopted as a framework for the trustworthiness inquiry in this case.

### b. Trustworthiness of McKee's and Flota's Statements

 Viewed through the prism of these factors, there is little about McKee's and Flota's statements that indicates they were trustworthy enough to rebut their presumed unreliability. At most, only two factors support a conclusion that these statements were trustworthy. First, McKee and Flota each admitted that they committed acts that were contrary to their penal interest. Each stated he had prior knowledge that Ms. McKee was going to be murdered before the group went down to the lake. Each also stated that they were either physically or audibly present when the injuries that killed Ms. McKee were inflicted, and that they either inflicted some of these injuries or did nothing to stop them. Each also admitted to helping to eliminate evidence of the crime.

Second, it is undisputed that by virtue of their admitted presence while the murder occurred, McKee and Flota had personal knowledge of the key events they described in their statements. The relatively limited period of time that had passed since the crime makes it unlikely that they were unable to remember the type of details contained in their statements.

In contrast, none of the remaining factors supports a finding that these statements were trustworthy. First, it is questionable whether these statements can be viewed as ones that were made "voluntarily." While the statements do not appear to have been the product of the type of undue coercion or duress that would render a confession "involuntary" under the Fifth Amendment, all three statements were made while McKee and Flota were at the Moses Lake Police Department, and the latter two statements were made after McKee and Flota had been arrested and were being investigated for the murder of Ms. McKee. The psychological duress that is inherent in such circumstances counsels caution in accepting such statements

as having been made "voluntarily." *See, e.g., Nazemian,* 948 F.2d at 530 (recognizing fact that statement is made while in custody is a circumstance that casts doubts on its reliability). This level of duress was enhanced by the fact that both McKee and Flota were told during their interrogations that they had been implicated in the crime by others. *See, Lee,* 476 U.S. at 544 (fact that statement was made after declarant was told that he had been implicated in crime is circumstance that undermines its reliability).

These statements, which were made more than two weeks after Ms. McKee's murder, also are not the type of "spontaneous" or "contemporaneous" statements that the law deems reliable.[8] Additionally, the statements were not made to trusted confidants or other persons to whom McKee and Flota were unlikely to lie. Nor can the manner in which McKee and Flota were questioned by the investigating officers, who had only recently learned of Ms. McKee's death and of McKee's and Flota's potential involvement in her death, be fairly construed as equivalent to contemporaneous cross-examination. Moreover, there was nothing about McKee and Flota or their mental state that suggests that these statements were especially likely to be trustworthy. Indeed, the traumatic nature of the events in question and the fact the statements were made in the course of custodial interrogation suggests the opposite.

Most importantly, McKee and Flota had a strong incentive to misrepresent their role in the murder and shift the blame to Petitioner. Indeed, this is the very basis of the presumption of unreliability that accompanies those portions of confessions that incriminate individuals other than the confessor. In McKee's case, there was a powerful motive to shift blame to others because the murder victim was his wife and he had repeatedly indicated that he wished to either kill her or

have her killed. *See, e.g.,* Trial Record at 1493 (McKee offered friend $4,000 to kill Ms. McKee shortly after their marriage). The motive to lie and shift blame is equally pronounced with respect to Flota, who admitted that he personally participated in the assault on Ms. McKee, but claimed that his conduct caused her no harm. McKee's and Flota's motives were even more prominent given that there was evidence that tensions had arisen between them and Petitioner and that Petitioner had threatened to turn in his four codefendants for murdering Ms. McKee. *See* Trial Record at 584 (testimony of Hughes).

Moreover, even the most cursory review of McKee's and Flota's statements reveals that they minimized their own role in the murder and placed the blame squarely on Petitioner's shoulders. In his initial statement, for example, McKee stated:

> He [Whelchel] told me if I tried to do anything, he'd he'd do the same thing to me. He said he would have killed me right there on the spot too.... I wanted to stop him, I wanted to and that but he wouldn't, he wouldn't stop you know, so I took off .... I kept blackin' out and I was shaking and everything and then about I don't know, an hour to a half an hour later, they, he um Beth came up and that and said, "Don't worry, every thing's okay. Steve won't do anything to you, you know. Nothing will happen to us." I, I just, I couldn't handle it.

Respondent's Exhibit 26 at A10. The lack of trustworthiness of McKee's statements is also demonstrated by the fact that he initially came to the police station not to make a clean breast of his role in his wife's murder, but to file a missing person's report. Additionally, a comparison of McKee's two statements reveals substantial inconsistencies that call into

---

**8.** The *Layton* decision's discussion of these well-established hearsay exceptions appears to collapse the "firmly rooted hearsay exception" and "particularized guarantees of trustworthiness" approaches to determining the reliability of extrajudicial statements under the Confrontation Clause. *See People of the Territory of Guam v. Ignacio,* 10 F.3d 608 612 n. 2 (9th Cir.1993) (rejecting *Layton's* multifactor test as sole means of assessing reliability in favor of two-prong ap-

proach described in *Wright*). Nevertheless, the Court has independently considered and rejected the possibility that these statements correspond to other firmly rooted exceptions, such as the exception for coconspirator statements. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (to fall within definition of coconspirator hearsay exception, statements must be made during course, and be in furtherance, of conspiracy).

question the veracity of his version of the murder.[9] *Compare, e.g.*, Respondent's Exhibit 26 at A26 (contending that McKee did not believe his wife would be assaulted) *with* Respondent's Exhibit 27 at A47 (acknowledging that McKee participated in game to choose who would murder Ms. McKee).

Flota's single statement also contains similar passages that downplay his role and portray Whelchel as the moving force behind the assault on Ms. McKee. *See, e.g.*, Respondent's Exhibit 28 at A70:

> Flota: ... it was the three of us [McKee, Flota and Hughes] sitting on the hill and we weren't sure what was going on and at that point, I didn't really care, okay, I was almost to the point where I was going to puke, just the first impact, I got this queasy feeling in my stomach and just, you know, oooo, turned and walked out.... And after that point, Steve sort of started getting meaner, his voice started getting meaner and he just changed quickly, started to wig out on us. And after that point we knew that if we didn't do what Steve was going to say, we were going to get the shit beat out of us, not killed or anything, just get beat up for a while....

All three of these statements are replete with similar examples of McKee and Flota painting a picture of themselves as the unwilling pawns of the Petitioner in the assault on Ms. McKee.

Balancing these factors, there is little about these statements—statements in which two admitted participants in Ms. McKee's murder place the blame for that murder on Petitioner—that suggests they were made in circumstances endowing them with particularized guarantees of trustworthiness. Thus, the admission of these statements violated Petitioner's right to confrontation under the Sixth Amendment.

### 3. Prejudice

The heart of this case is the question of whether this error was sufficiently prejudicial to Petitioner to warrant granting his petition. This question was also reached by the Supreme Court of Washington in its consideration of Petitioner's initial appeal, and Washington's justices were divided on the question of whether this error was harmless.[10] For reasons similar to those that were elaborated persuasively in the supreme court's dissenting opinion, this Court concludes that this error was not harmless.

### a. Legal Standard

■■■ The question of prejudice posed in this case differs somewhat from that decided by Washington's courts, which were required to determine whether the admission of these

---

9. Similar inconsistencies exist between McKee's and Flota's statements and the trial testimony of Hughes and Massey. *Compare, e.g.*, Respondent's Exhibit 27 at A48–50 (McKee, contending he fled scene shortly after Petitioner began assaulting Ms. McKee) *with* Trial Record at 624 (Massey, contending McKee returned to assault scene during the assault); *see also Webb*, 44 F.3d at 1392 (existence of contradictory extrinsic evidence is permissible consideration in determining whether statements are *unreliable*). The Court gives these inconsistencies limited weight, however, because, for the most part, they appear to be the type of disparities that naturally attend the description of a traumatic story from four different perspectives.

10. The process of federal collateral review of state court convictions necessarily places district courts in the uncomfortable position of "second-guessing" the considered opinions of state appellate courts on questions such as harmlessness. While federal courts may not give formal deference to the conclusions of state courts on such questions in cases filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, the reasoning of these courts often provides valuable and persuasive insights into a case, and their factual findings must be accorded a presumption of correctness. It is particularly unfortunate, therefore, that the question of harmlessness was never put to the court best situated to determine the effect that McKee's and Flota's statements had on Petitioner's verdict: the trial court. Because of considerations of federalism and comity, this Court cannot simply remand this case to the trial court for a determination of this issue. Thus, the Court, like the Washington appellate courts that preceded it, must fulfill its constitutional and statutory obligations from the less advantageous perspective of a review of a cold record, without the benefit of the insights that come from the first-hand observation of the presentation of the evidence before the jury.

statements was "harmless beyond a reasonable doubt." *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In contrast, because Petitioner now is attacking his conviction collaterally based on trial error, the question is whether that error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 622, 640–41, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (plurality opinion and Stevens, J., concurring); *see also O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (following *Brecht* ); *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (origin of *Brecht* standard).

■■■■ Neither party bears the burden of proof on this question. Instead, a court must conduct a de novo review of the entire record and determine this question "without the benefit of such aids as presumptions or allocated burdens of proof." *O'Neal,* 513 U.S. at 437 (internal quotation omitted). If a court is convinced that error was not harmless, or if the court is in grave doubt because the evidence relating to harmlessness is in virtual equipoise, a petitioner's conviction must be overturned. *Id.* at 432; *Thompson v. Borg,* 74 F.3d 1571, 1574–75 (9th Cir.1996).

■■■■ While it is undisputed that the *Brecht–Kotteakos* harmless error standard governs this case, the Court has found it difficult to come to a precise understanding of what it means to say that an error had a "substantial and injurious effect or influence in determining the jury's verdict." From this standard's plain language, it is apparent that it must have had some effect or influence on the jury's "verdict;" *i.e.,* whether the jury ultimately would have convicted or acquitted if the error had not occurred. It is also well established that this inquiry focuses on the jury that decided the petitioner's fate rather than what a court thinks a hypothetical "rational" jury would have done had the error not occurred. *See, e.g., Kotteakos,* 328 U.S. at 765 ("The inquiry can not be merely whether there was enough to support the result .... It is rather, ... whether the error itself had substantial influence."); *see also California v. Roy,* 519 U.S. 2, ——, 117 S.Ct. 337, 339, 136 L.Ed.2d 266 (1996) (Scalia,

J., concurring) (trial error "can not be rendered harmless by the fact that, given the evidence no reasonable jury would have found otherwise. To allow error to be cured in this fashion would be to dispense with trial by jury."). Additionally, it is a matter of common sense that the "injurious" component of this standard means the error must have made it more likely that the jury would convict the petitioner; errors that are helpful or noninjurious are, by definition, harmless.

Less clear is what it means to say an injurious effect or influence on the jury's verdict was "substantial." Virtually all of the published judicial decisions identifying or applying this standard simply recite the standard and then conclude that the facts of the case either meet or fail to meet it. In the Supreme Court decision that originally enunciated this standard, for example, the Court described this standard in the following circular fashion:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand .... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos,* 328 U.S. at 764–65.

One possibility is that this embodies the type of "but for" requirement that is commonly found in causation inquiries; *i.e.,* that but for the error, the jury would not have convicted the petitioner. Because the standard focuses on whether the injurious effect or influence was "substantial," however, such an approach would be inconsistent with the general recognition that the "substantial factor" approach to causation involves a different inquiry than "but for" causation. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S.

228, 293 n. 4, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (Kennedy, J. dissenting); *SEC v. Murphy,* 626 F.2d 633, 650 (9th Cir.1980). Moreover, the circuits that have addressed this question have concluded that the *Brecht–Kotteakos* standard does not require "but for" causation. *See; e.g., Robinson v. Arvonio,* 27 F.3d 877, 885 (3d Cir.1994).

■ Instead, this test appears to require only that the error made it substantially more likely that the jury would convict rather than acquit. This approach is consistent with the common understanding of the term "substantial" as describing a point between "de minimis" and "necessary" that tends toward the more demanding end of that scale. *See, e.g.,* Webster's New Third International Dictionary at 2280 (unabridged 1967) (defining substantial as "something of moment: an important or material matter."); *see also* Black's Law Dictionary 1428 (6th ed.1990) (defining substantial as "[o]f real worth or importance; of considerable value ... actually existing; real; not seeming or imaginary, not illusive"). It is also consistent with the infrequent discussions of the term "substantial" in the Supreme Court's and Ninth Circuit's case law, which have tended to characterize an effect as substantial when its impact is important rather than de minimis. *See, e.g., United States v. Lopez,* 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); *United States v. Juvenile Male,* 118 F.3d 1344, 1348 (9th Cir.1997). Most importantly, however, it also is consistent with the Supreme Court's characterization of this standard in *Brecht* and *Kotteakos* as being less stringent than *Chapman*'s "harmless beyond a reasonable doubt" inquiry, but more demanding than a simple inquiry as to whether enough evidence was presented to support the conviction.

Moving to the more specific context of this case, the Supreme Court has elaborated an illustrative set of factors that should be weighed when assessing the harmlessness of Confrontation Clause violations.

These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *see also Brecht,* 507 U.S. at 639 (looking at frequency of error, relevance of error to state's case, whether error was cumulative of properly admitted evidence, and strength of state's case).

■ The consideration of these and other relevant factors necessarily involves some level of guesswork because a court cannot simply ask jury members why they reached a particular verdict. A court's inquiry must be based on evidence, however, not simply speculation as to what went through the jury's mind. For example, in a Confrontation Clause case, it is not permissible to base an assessment as to harmlessness on speculation as to whether the witness's testimony would have been the same, or the jury's verdict unaltered, if the defendant had been able to confront the witness at trial. *Coy v. Iowa,* 487 U.S. 1012, 1021–22, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988); *see also Kotteakos,* 328 U.S. at 750 ("it is not the [] court's function to determine guilt or innocence. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out.").

### b. The Effect of McKee's and Flota's Statements on the Verdict

■ Having applied these factors and considered the relevant evidence, the Court concludes that the admission of McKee's and Flota's statements had a substantial and injurious effect or influence on the jury's verdict. This is true regardless of whether this test entails a "but for" inquiry or a lesser showing of effect on the jury's verdict. Moreover, while this is a close case, it is not one in which the Court is in grave doubt or in which the evidence is in virtual equipoise.

The record indicates that the first factor listed above—the importance of these statements to the prosecutor's case—weighs in favor of a finding that the jury's verdict was substantially and injuriously affected by

these statements. At trial, the prosecutor presented three basic types of evidence implicating Petitioner in the murder of Ms. McKee: 1) the testimony of each of Petitioner's four codefendants, all of whom implicated him as the person most responsible for Ms. McKee's death; 2) testimony of third parties, who either placed Petitioner near the scene of the murder or heard him make incriminating statements regarding the murder; and 3) physical evidence, such as clothes and a knife that may have been one of the murder weapons that were found in Petitioner's car when he was arrested.

The most important leg of this triad was the testimony and statements of the codefendants, each of whom was present at the murder and participated in the events directly preceding the murder. Such testimony is almost always powerfully incriminating, so much so that the Supreme Court has concluded that it is beyond the capability of most jurors to ignore such testimony when it is improperly admitted. *See Bruton,* 391 U.S. at 135–36. Here, in contrast to the situation that the Supreme Court found objectionable in *Bruton,* the jurors were expressly permitted to rely on McKee's and Flota's testimony in determining whether Petitioner was guilty or innocent.

Moreover, without these statements, the prosecution's eyewitness testimony would have been limited to the testimony of Hughes and Massey. As discussed in the Court's first summary judgment order, Hughes' role in the actual murder was very limited as she quickly fled the scene after the assault began and never actually saw Petitioner strike Ms. McKee. Massey, by her own testimony, participated directly in the assault on Ms. McKee, and, thus, as defense counsel pointed out to the jury, she had a powerful motive to shift the principal blame for murder to Petitioner. By introducing the statements of McKee and Flota, the State not only presented two additional eyewitnesses to the assault, but also was able to highlight the interlocking nature of their versions of the murder, all of which asserted that Petitioner was present

and directly participated in the assault on Ms. McKee. Indeed, the prosecutor placed such emphasis on the importance of McKee's and Flota's statements that he referred to them extensively in his closing argument, including direct quotations from the statements and assertions that the four stories "dovetailed" on their material points. *See, e.g.,* Trial Record at 2067, 2071, 2075–76, 2160–61.

The second *Van Arsdall* factor—whether the impermissible testimony was cumulative of other evidence—favors a finding of harmlessness, but not in a dispositive fashion. In many regards, the McKee and Flota statements are cumulative of the live testimony of Massey and Hughes. Both Massey and Hughes, for example, testified that Petitioner indicated well in advance of the murder that he intended to kill Ms. McKee and that he was both present at the time of the murder and inflicted the first blow to the victim. Massey also testified that Petitioner repeatedly beat and eventually stabbed the victim, something that McKee and Flota also stated in their taped statements. On a broader plane, the McKee and Flota statements were also cumulative of the testimony of third parties, described more fully below, who either placed Petitioner near the scene of the murder or heard him make incriminating statements regarding the murder.

There are, however, a number of significant elements that are contained in McKee's and Flota's statements but not in Massey's or Hughes' testimony. For example, both McKee and Flota state that shortly after arriving at the murder scene, they and Petitioner participated in a macabre game of "odd man out" to determine who would murder Ms. McKee, and that Petitioner decided to begin the assault even though he was not selected. Additionally, while both Flota and Massey stated that Flota placed the victim in a chokehold, only Flota contended that Ms. McKee was still alive when he finished, thereby implying that the injuries that killed her were inflicted by Petitioner.[11] Finally, it also is significant that only Flota and Massey

---

11. Although the forensic pathologist who examined Ms. McKee's body attributed her death to blunt impacts to her head and stab wounds to her chest area, the advanced state of decomposi-

tion of her body precluded him from determining whether she actually died from strangulation. Trial Record at 481, 494.

testified they were present during the assault after the initial blows were inflicted. Without Flota's statement regarding what occurred during this period, the only direct evidence detailing Petitioner's alleged assault on Ms. McKee was the testimony of Massey, who, as an admitted assailant, had an obvious motive to shift blame. In such a context, McKee's and Flota's statements cannot fairly be construed as being simply "cumulative."

The third factor—the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points—is more difficult to assess. Generally, courts have viewed the existence of corroborating evidence as a factor that decreases the likelihood that improperly admitted testimony affected or influenced the jury's verdict. *See, e.g., United States v. Sasson*, 62 F.3d 874, 885 (7th Cir.1995), *cert. denied*, 516 U.S. 1131, 116 S.Ct. 953, 133 L.Ed.2d 876 (1996). The underlying rationale of this view appears to be that the existence of corroborative evidence makes it more likely that the jury based its verdict on the properly admitted evidence rather than the tainted testimony.[12] In this sense, however, this factor adds little to the harmlessness inquiry that is not already accomplished by considering whether the improperly admitted testimony was cumulative and whether the prosecution's case was otherwise strong. In other words, for corroborative evidence to reduce the likelihood that improperly admitted testimony affected or influenced the jury's verdict, the corroborative evidence must possess some independent prejudicial value apart from its relationship to the tainted evidence; *i.e.*, it must be cumulative to some extent. If not, its primary value to the prosecution is to enhance the credibility of the tainted testimony in the jurors' eyes, thereby increasing the likelihood that this testimony affected or influenced the verdict. By the same token, the existence of evidence contradicting the tainted testimony decreases the likelihood that the testimony affected or influenced the ver-

dict because contradictory evidence undermines the probative value of the erroneously admitted testimony.

In this case, the statements of McKee and Flota were corroborated by other evidence on most of their key points. The testimony of Massey and Hughes corroborated those statements on the crucial questions of whether Petitioner premeditated Ms. McKee's murder and whether he inflicted the injuries that resulted in her death. To a lesser extent, their testimony was also corroborated by the testimony of third parties, described more fully below, who either placed Petitioner near the scene of the murder or heard him make incriminating statements regarding the murder.

The principal impact of this evidence, in the Court's view, was to increase the likelihood that Petitioner was convicted on the basis of the improperly admitted McKee and Flota statements. As already discussed, the existence of this evidence did, to some extent, increase the probability that the jury based its decision on properly admitted evidence. This consideration, however, is already taken into account by other *Van Arsdall* factors. As yet unaccounted for is the harmful effect that the existence of evidence corroborating McKee's and Flota's statement had on the jury.

There is little doubt the corroborating evidence had such an effect in this case. This was not a case where the prosecution presented a powerfully incriminating pattern of physical and testimonial evidence. Rather, this case was built almost entirely on the testimony of the four codefendants, each of whom had a strong motive to shift the blame to someone else. Thus, that testimony was naturally suspect because of this motive, a point that Petitioner's trial counsel repeatedly brought home to the jury. The fact that all four told essentially the same story greatly enhanced the weight of this evidence.

12. The existence of corroborating evidence can also be viewed as supporting a finding of harmlessness because it reduces the likelihood that a defendant was convicted on the basis of inaccurate or untruthful extrajudicial statements. This view of harmlessness does not square with the *Brecht–Kotteakos* standard's focus on whether the improper testimony affected or influenced the verdict. Rather, this approach is simply a different means of assessing the reliability of the tainted testimony. As already discussed, this approach to assessing reliability has been rejected by controlling precedent.

Thus, the corroborative effect of Hughes' and Massey's testimony enhanced the credibility of McKee's and Flota's statements, just as those statements enhanced the prejudicial value of Hughes' and Massey's testimony. The net effect was that the prosecutor was able to present the interlocking testimony of four codefendants, rather than two, a factor that almost certainly was harmful to Petitioner's chances of gaining an acquittal.

On the other hand, Petitioner also presented evidence that contradicted McKee's and Flota's statements. Specifically, Petitioner testified that he played no part in the murder, and his father, mother, and sister all testified that he was at home when the murder occurred. Because this testimony gave the jury a basis for questioning the credibility of McKee's and Flota's statements, it increases the likelihood that the admission of those statements was harmless error. Ultimately, however, the effect of this testimony on the jury's consideration of McKee's and Flota's statements was probably minimal because, as discussed below, Petitioner's alibi was effectively impeached by other evidence.

In sum, this third factor was one that increased the likelihood that McKee's and Flota's statements had a substantial and injurious effect or influence on the jury's verdict. The existence of evidence corroborating McKee's and Flota's statements served principally to enhance the harmfulness of those statements, and Petitioner's contradictory evidence had minimal effect on the harmfulness of these statements.

The next *Van Arsdall* consideration—the extent to which some cross-examination was permitted—works unambiguously against a finding of harmlessness. McKee and Flota never testified in any pretrial proceeding or at trial, other than to indicate that they would invoke their Fifth Amendment right not to incriminate themselves. Thus, the testimony that the jurors viewed was solely their potentially self-serving version of the

events, unchecked by the truth-enhancing protections inherent in the right of confrontation: testimony under oath, in front of a jury and the accused, subject to cross-examination.

The final *Van Arsdall* factor—the overall strength of the prosecution's case—favors a finding that Petitioner was unfairly prejudiced by the admission of the McKee and Flota statements. This was not a case where the untainted evidence was so strong that the erroneous admission of McKee's and Flota's statements likely had little or no effect on the jury. Close scrutiny of the prosecution's case reveals that the evidence against Petitioner was far from overwhelming.

The strongest pillar supporting the prosecution's case was the direct testimony of Hughes and Massey, which clearly implicated Petitioner in the murder of Ms. McKee. Such testimony is inherently suspect, a consideration that the trial court properly instructed the jury they should take into account when considering how much weight it should be given in their deliberations.[13] Moreover, defense counsel described to the jury numerous reasons why they should give this testimony little weight. First, as participants in the murder conspiracy, both Hughes and Massey had a substantial motive to downplay their role and shift the blame to the other participants, such as Petitioner. This motive was most pronounced for Massey, who provided the most incriminating testimony because she was present throughout the entire assault on Ms. McKee. Hughes had less of a motive to shift blame from herself because of her more limited role in the murder, but the limited nature of her participation also undercut the strength of her testimony because, unlike Massey, Hughes never actually saw Petitioner strike or stab Ms. McKee.

Additionally, Massey and Hughes both had additional motives to shift the blame for the

---

**13.** Respondent contends that the fact that this instruction was given makes it less likely that McKee's and Flota's statements had a substantial effect or influence on the jury's verdict. While the Court agrees, it does not believe this additional factor merits great weight. The difficulty of ignoring incriminating codefendant testimony is well recognized. Moreover, the trial court's instruction also made it less likely that the jury would have convicted Petitioner on the basis of Hughes' and Massey's testimony absent the powerful corroborative effect of McKee's and Flota's statements.

murder from themselves and McKee and Flota. At the time of the murder and the arrests, for example, Hughes was Flota's girlfriend. Petitioner and Massey also had been involved at the time of the murder, but had become estranged in the weeks thereafter because Petitioner believed Massey was dating one of his friends. Trial Record at 584, 613, 636, 699. More significantly, there was evidence that tensions had developed between Petitioner and all of his codefendants by the time of their arrests because Petitioner had threatened to turn them in for their role in the murder. Finally, both Hughes and Massey testified pursuant to agreements with the State under which they received lenient treatment in return for their promise to testify against McKee, Flota, and Petitioner. In sum, as the defense and trial court pointed out, there was ample reason for the jury to treat the testimony of Hughes and Massey with caution.

There was also testimony from a number of third parties who either saw Petitioner near the scene of the murder or heard him make incriminating statements regarding the murder. As with Hughes' and Massey's testimony, however, the strength of this evidence was substantially undermined at trial. For example, McKee's apartment manager testified that he saw Petitioner with the group that went down to Moses Lake shortly before Ms. McKee's murder, but he also testified that: 1) he was sleepy at the time; 2) the group consisted of five persons, not the six that all four of Petitioner's codefendants claimed were present; 3) he only saw these people from behind and identified Petitioner based on his build and hair; 4) he had only seen Petitioner and Flota in passing on a small number of occasions prior to the murder; and 5) he did not identify Petitioner until several months after the murder. Trial Record at 732, 737–38, 740–41.

Additionally, although witnesses testified that Petitioner made statements before and after the murder indicating he had helped kill, or would like to kill, Ms. McKee, there are strong reasons to question the accuracy or probative value of these statements. Many of these individuals were persons who had reasons to carry a grudge against Petitioner. See, e.g., id. at 850–51 (admitting Petitioner had previously "put me in the hospital" in a fight). In addition, most of the statements were generally ambiguous and potentially consistent with his admitted role in the murder conspiracy after the fact. See, e.g., id. at 753, 765 (Flota and Petitioner casually told two friends that "we killed" and "they killed" Ms. McKee.); id. at 896–901 (witness admitted he could not recall Petitioner's exact words and that witness "crashed" due to heavy drinking after talking with Petitioner). In fact, the only witness who testified that Petitioner unequivocally admitted he had personally participated in Ms. McKee's murder was a former cell mate of McKee and Petitioner who testified at the request of McKee. Trial Record at 917–26. Moreover, there was evidence in the record that indicated Petitioner had a penchant for claiming involvement in murders that he did not commit, evidence from which the jury could reasonably have inferred that Petitioner's statements were merely a perverted form of puffery that were not based in fact. See Respondent's Exhibit 26 at A31 (statement by McKee that Petitioner bragged about being involved with organized crime and of killing 64 people).

This also was not a case where overwhelming physical evidence linked Petitioner to the crime. According to the prosecution, the clubs that were used to assault Ms. McKee were never recovered. No blood was found on Petitioner's clothes, and the prosecution was unable to establish conclusively that Petitioner's knife was the weapon that was used to stab Ms. McKee. While evidence relating to the crime, including Ms. McKee's purse, was found in the car in which Petitioner was stopped prior to his arrest, this is entirely consistent with his version of his role in the murder as being one of an accomplice after the fact rather than a direct participant.

Additionally, the strength of the prosecution's case was undercut, to some extent, by the fact that Petitioner mounted a vigorous, affirmative defense of his innocence. Petitioner himself took the stand and described for the jury a markedly different version of events than was described by his codefendants. According to Petitioner, he returned

home from the McKee's apartment several hours before the murder and did not learn of the murder until the next day. In support of this story, three members of Petitioner's family testified that they saw him at home on the morning of the murder, a time when, according to his codefendants, Petitioner was either killing Ms. McKee or sleeping afterwards at the McKees' home. Additionally, a former cell mate of McKee's testified that McKee had bragged and joked with him about his involvement in Ms. McKee's murder without ever mentioning involvement by Petitioner. Trial Record at 1793–96. While this evidence is riddled with many of the inconsistencies and flaws that existed with regard to the prosecution's case-in-chief, this evidence gave the jury an additional reason to question whether Petitioner had actually participated in the murder of Ms. McKee.

Finally, there is an additional indicator that the prosecution's case was not strong: the extent to which the jury struggled to reach its verdict. In most cases, the hallowed principle of jury secrecy combined with the many potential factors that might underlie a jury's verdict make it difficult or impossible to divine how a jury viewed the evidence in a case. In this case, however, the jury broke from its deliberations at one point to tell the trial court that it was unable to reach a unanimous verdict after taking three separate votes and weighing all of the evidence.[14] While not a controlling factor, the jurors' difficulty in reaching a verdict even when they had before them the improperly admitted statements suggests that the prosecution's untainted evidence was not so strong that the improper admission of McKee's and Flota's statements was harmless.

In sum, having considered the factors detailed above, the Court concludes that the admission of McKee's and Flota's statements had a substantial and injurious effect on the jury's verdict.

## B. GEORGE FLOTA'S TESTIMONY

Petitioner also contends that the trial court erroneously allowed a videotape of Flota's father—George Flota—to be played for the jury. As with Petitioner's claims regarding the admission of Flota's and McKee's audiotaped statements, this ground for relief arises out of the Confrontation Clause. Thus, this claim is subject to the same two-part analysis as to whether the alleged error violated the Confrontation Clause, and whether any such error was sufficiently prejudicial to Petitioner to warrant relief.

This issue was raised in Petitioner's direct appeal and was considered by the Court of Appeals of Washington. That court, the only state court to reach this issue, held that the admission of George Flota's videotaped testimony violated the Confrontation Clause, but that this violation was harmless. Washington's supreme court declined to review this issue. Though this analysis, described below, differs somewhat from that of the court of appeals, its conclusion is the same.

### 1. Factual and Procedural Background

Petitioner testified at this trial that he was not present when Ms. McKee was murdered. According to Petitioner, he had been at the McKees' apartment on the night of September 26, 1986, but he left several hours before the murder occurred, returning home by around 1:30 a.m. He remained awake for several hours, watching television, then fell asleep and slept until 10:30 or 11:00 a.m. on September 27, 1986. After rising, he ate breakfast, then remained at home until sometime that afternoon, when he went to the McKee's apartment. Later that evening, McKee and Flota told him they, Massey, and Hughes had killed Ms. McKee.

Three members of Petitioner's family testified that Petitioner was at home on the morning of the murder. Petitioner's mother testified that she awoke around 3:30 a.m. and found Petitioner watching television in her living room. Petitioner's sister testified that

---

14. There is no direct reflection of this communication in the trial record provided to the Court by Respondent. This communication was described in the Supreme Court of Washington's opinion, which is part of the record of proceed- ings, *see* Respondent's Exhibit 15 (Utter, J., dissenting, citing the trial court clerk's papers), and Respondent has raised no evidentiary objection to Petitioner's reliance on this consideration.

she was awakened at the same time by a conversation that Petitioner had with his mother. Petitioner's mother and father also testified that when they arose for the day at 6:00 a.m., Petitioner was asleep in their living room. They also testified that he rose shortly before noon and remained at home until later that afternoon. Petitioner's sister also testified that Petitioner was asleep at home when she awoke that morning.

In addition to the statements and testimony of Petitioner's four codefendants, four witnesses directly contradicted his story that he was at the Whelchel home on the morning of September 27, 1986. The first witness, the apartment manager at the McKees' apartment complex, testified that he saw Petitioner leave the McKees' apartment at 3:30 a.m. on September 27, 1986 in the company of Ms. McKee, her husband, Massey and Hughes. Two additional witnesses—Jeanetta Massey (Massey's mother), and Deputy Sheriff Detrolio ("Detrolio") of the Grant County Sheriff's Office—testified that they went to Petitioner's family home between noon and 1:00 p.m. that day in connection with a runaway complaint that Jeanetta Massey had filed regarding her daughter Beth. Detrolio testified that he saw no sign of Petitioner at the home and that he was told Petitioner was not living there. Detrolio also testified that he stopped McKee and Petitioner in McKee's car in a separate part of town at 2:10 p.m. and that their car was full of laundry. Jeanetta Massey testified that she went to Petitioner's home after Detrolio, where she saw George Flota and talked to the Whelchels in their kitchen. She also saw no sign of Petitioner and was told by the Whelchels that he was not living there at that time.

The fourth witness was George Flota, Jeffrey Flota's father. Flota testified that he went to the Whelchel home during the late morning of September 27, 1986, and that he was there in the Whelchel's kitchen when Detrolio and Massey arrived. Like Detrolio and Massey, he testified that he saw no sign of Petitioner at Whelchels' residence, and that Petitioner's family gave him no indication of Petitioner's whereabouts. Flota also testified that he arrived earlier than Detrolio and Massey, but could not place the time

exactly. Flota also provided additional testimony regarding the relationship between the Flotas and Petitioner, including a description of a fight in which the three of them used clubs made from table legs to defend themselves from others.

In their trial testimony, Petitioner's father and mother acknowledged that Flota, Detrolio, and Jeanetta Massey visited their residence and were told that Petitioner was not at home. They contended, however, that these visits occurred during the late morning or early afternoon of September 24–25, 1986, several days before the murder occurred. Contrary to this testimony, however, records from Grant County's 911 Dispatch center and the testimony of Grant County 911 Dispatch Supervisor Rowland corroborated that Detrolio was dispatched to the Whelchel home at 12:15 p.m. on September 27, 1986.

George Flota's testimony was presented by means of a videotape of his deposition. Portions of this videotaped testimony were played for the jury, once in the prosecution's case-in-chief, and once for the purpose of impeaching Petitioner's alibi. Trial Record at 928, 2054; *see also* Respondent's Exhibit 25 (transcript of videotape). Ultimately, the entire videotape was played for the jury. Petitioner objected to the admission of this testimony on the ground that the prosecution had not shown that George Flota would be unavailable as a witness. *Id.* at 227, 927. The trial court, in a preliminary proceeding, ruled that because George Flota would be moving to Arkansas for a new job prior to the trial, he would be unavailable to testify at trial. *Id.* at 229.

Petitioner challenged this ruling on appeal. The Court of Appeals of Washington concluded that the admission of this testimony violated the Confrontation Clause. Respondent's Exhibit 2 (unpublished opinion) at A7–A8. That court predicated its ruling on its finding that the State had made no effort to secure George Flota's live testimony at trial and, therefore, had not demonstrated that he was legally unavailable to testify at trial. The court of appeals declined to reverse Petitioner's conviction on this ground because it viewed the error as harmless. *Id.* at A9. Although Petitioner appealed this ruling to

the Supreme Court of Washington, that court exercised its discretion not to review this aspect of the court of appeals' decision.

### 2. Confrontation Clause Violation

■ The admission of George Flota's videotaped deposition testimony presents the reverse question from that posed by the admissions of McKee's and Flota's statements: whether testimony that fits a firmly rooted exception violates the Confrontation Clause if the declarant was not unavailable to testify at trial. In this case, the answer to this question is yes.

■ George Flota's testimony was taken at a prior judicial proceeding presided over by the trial judge, at which Petitioner was present and was represented by counsel who cross-examined the witness on the relevant points. As such, it falls within the "firmly rooted exception" for former judicial testimony, and there is no need to do an independent inquiry into its reliability. *Ohio v. Roberts*, 448 U.S. 56, 66, 72, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *United States v. Koon*, 34 F.3d 1416, 1426 (9th Cir.1994), *affirmed in relevant part*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); Fed.R.Evid. 804(b)(1).

The issue here is the proscription on admission of prior judicial testimony if the declarant is available to testify at trial. *See* Fed.R.Evid. 804(a); *Roberts*, 448 U.S. at 65, 74. Recent Supreme Court decisions have questioned the viability of the availability prong. *See, e.g., White v. Illinois*, 502 U.S. 346, 354, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). As the law stands today, however, this prong is a viable component of the constitutional inquiry when the hearsay exception at issue is the former judicial testimony exception described by Fed.R.Evid. 804(b)(1). *Id.; see also Swan v. Peterson*, 6 F.3d 1373, 1379 n. 2. (9th Cir.1993).

■ For Confrontation Clause purposes, absolute unavailability is not required. When, as here, witnesses are outside of the jurisdiction of the trial court, it is enough that the state makes a "good faith" or reasonable effort to secure their attendance. *Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *Acosta–Huerta v. Estelle*, 7 F.3d 139, 143 (9th Cir. 1992). Where the state makes no effort whatsoever to secure a witness's attendance at trial, the witness is not legally unavailable. *Christian v. Rhode*, 41 F.3d 461, 467 (9th Cir.1994).

Here, the Court of Appeals of Washington determined that the State simply "accommodated George Flota in his employment transfer to Arkansas and made no effort to seek his attendance at trial." Respondent's Exhibit 2 at A8. This "no effort" determination is a factual finding that this Court must presume to be correct, 28 U.S.C. § 2254(e)(1) (formerly § 2254(d)). That presumption has not been rebutted. Rather, the trial record indicates that this issue was decided before trial, and George Flota was released from his subpoena at that time and allowed to move to Arkansas. There is no subsequent indication in the record that the State attempted to avail itself of any potentially available procedure to have George Flota testify in person at trial. This failure to attempt to secure George Flota's live testimony at trial violated Petitioner's right of confrontation under the federal constitution.

### 3. Prejudice.

■ The Court agrees with Respondent, and the Court of Appeals of Washington, that the prejudice to Petitioner stemming from the admission of George Flota's testimony does not, on its own, render his conviction constitutionally suspect. That is not to say that Petitioner suffered no prejudice as a result of this testimony. Petitioner relied heavily at trial on his testimony and that of his parents and sister that he was at home asleep when the murder occurred. To the extent that George Flota's testimony undermined this alibi, it must have had some injurious effect on the verdict.[15]

---

**15.** There are other senses in which Flota's testimony was potentially prejudicial, such as his general description of Petitioner as an aggressive individual. Any such prejudice arising from these aspects of Flota's testimony are so minimal, however, that there is little likelihood that they played much, if any, role in the jury's deliberations.

For the most part, however, George Flota's testimony duplicated that of Deputy Detrolio and Jeanetta Massey. All three of these individuals visited the Whelchel home during the late morning and early afternoon of the day on which Ms. McKee was murdered. None saw any sign of Petitioner or was given any indication that the Whelchels knew where their son was. The only sense that George Flota's testimony was distinct from Detrolio's and Jeanetta Massey's is that he arrived at the house slightly earlier than they did. This distinction is irrelevant, however, given that Petitioner and his parents all testified that he remained at the home until sometime in the early to late afternoon, well after Detrolio and Jeanetta Massey testified that they visited the Whelchel home. Additionally, at least three other witnesses placed Petitioner at the McKees' apartment on the morning of the murder rather than at his home: Hughes, Massey, and the apartment manager. While there are difficulties individually with each of these witnesses, their testimony means that George Flota was one of six individuals (excluding McKee and Flota) who directly or indirectly challenged Petitioner's alibi.

Moreover, a close reading of the testimony of these three visitors indicates that, if anything, George Flota's testimony was of marginal importance to the prosecution's case. As already discussed, his testimony was almost entirely cumulative on its material points with that of Detrolio and Jeanetta Massey. Additionally, the principal damage to Petitioner's alibi came from his parents' admissions that these individuals came over at a time when Petitioner was not at home, and Detrolio's testimony and supporting dispatch records, which convincingly established that these visits came on the same morning that Ms. McKee was murdered. The main value of George Flota's testimony was that it corroborated the testimony of McKee and Detrolio on points for which their testimony was already so strong the increased probativeness imparted by George Flota's corroboration was marginal.

Petitioner also was given an opportunity to cross-examine George Flota, under oath, during the videotaped deposition. While this opportunity is not a perfect substitute for the right of confrontation at trial, the implications of George Flota's testimony to an alibi defense are not so subtle that they were likely to escape Petitioner's or his counsel's notice.

Finally, although the prosecution's case against Petitioner was not overwhelming, it was strong on the material points of George's Flota's testimony. Moreover, the balance of untainted evidence and prejudice is different with respect to George Flota's videotaped testimony than was the case with the improperly admitted statements of Petitioner's co-defendants. Direct testimony from coparticipants in a crime is a compelling type of evidence that is not easily ignored by a jury or overwhelmed by other evidence. In contrast, George Flota's testimony was indirect and one of a number of means by which the prosecution undermined Petitioner's alibi.

In sum, although the prosecution's case against Petitioner was not strong and George Flota's testimony was corroborated by other evidence, the nature of that testimony and the fact that Petitioner had an opportunity to cross-examine George Flota negated much of that testimony's prejudicial value. Thus, the trial court's error in admitting George Flota's videotaped deposition did not, on its own, have a substantial and injurious effect on the jury's verdict.

## C. THE BLUE BLANKET

Petitioner also contends that the trial court erroneously excluded from evidence a blue blanket that was found near the scene of the crime. Unlike the grounds for relief already discussed, this claim arises from the Fourteenth Amendment's prohibition on the deprivation of liberty without due process of law. Like Petitioner's Confrontation Clause claims, this claim alleges a type of "trial error" that is subject to a two-part inquiry as to whether a violation occurred and as to the prejudice flowing from that error. Because the Court concludes that no such error occurred, however, there is no need to assess whether Petitioner was prejudiced by the trial court's decision.

### 1. Factual and Procedural Summary

The potential relevance of the blue blanket can be seen in Flota's statement to the police, in which he admits holding a sheet or something over Emargo McKee's head while he put his "sleeper hold" on her. Respondent's Exhibit 28 at A84. He also admitted he saw something "blue" at the scene near a mattress. *Id.* at A85. Although a blue blanket was found at the murder scene, Trial Record at 1038–39, it was not collected or preserved by the State. In the spring of 1987, many months after the murder, Petitioner's investigators allegedly discovered a blanket near the scene that had a large, possibly human, bloodstain on it, as well as several natural blond and bleached blond hair fibers. *Id.* at 1112, 1393–96.

Petitioner sought the admission of this blanket at trial. Because the area in question was one that was frequently visited by local residents, and the stains and hair fibers could not be definitively established as belonging to any of the codefendants or the victim, the trial court concluded that it did not have sufficient relevance to Petitioner's case to warrant admission. *Id.* at 1949–50. This decision was affirmed by the Court of Appeals of Washington, Respondent's Exhibit 2 at A13–14, and was not reviewed by the Supreme Court of Washington.

### 2. Due Process Violation

■■■ The trial court's state law evidentiary ruling constitutes a valid grounds for federal habeas relief if that ruling violated due process. To determine whether an allegedly erroneous evidentiary ruling rises to the level of a due process violation, this Court must look to

> (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.

*Tinsley v. Borg,* 895 F.2d 520, 530 (9th Cir. 1990). This assessment of the importance of the evidence is then balanced against the State's interests in orderly trials, judicial effi-

ciency, and excluding unreliable or prejudicial evidence. *Id.*

Under this test, it is apparent that the trial court did not commit constitutional error. The evidence at issue was unreliable. The stain in question could not be confirmed to be human blood because it had been denatured over the course of its exposure to the elements. Similarly, although McKee and his wife apparently had blond and bleached blond hair, respectively, no testimony was presented of a more direct relationship than this broad correlation. Additionally, no testimony was presented that established this was in fact the "sheet" that Flota referred to in his statement or the "blanket" that was found at the murder scene when Ms. McKee's body was recovered.

Moreover, even if the blue blanket was the sheet referred to by Flota, its relevance to the question of Petitioner's guilt or innocence is marginal, at best. The fact that it had blood on it is to be expected if the blanket was in fact used to cover Ms. McKee's head while Flota choked her. This "fact" and the presence of hairs from the McKees are entirely consistent with the state's theory of the case, which posited that Flota choked Ms. McKee and that McKee was, at a minimum, beside his wife when she was attacked. The fact that no hair attributable to Petitioner may have been on the blanket is of marginal relevance given the length of time that it would have been exposed to the elements and the lack of any incriminating testimony that suggested Petitioner had used the blanket.

In sum, the Court concludes that although this evidence is capable of evaluation by the jury, it was of marginal probative value, unreliable, cumulative, and not properly construed as a major part of the defense. Because the value of this evidence to Petitioner was so limited, the State's interests in orderly trials, judicial efficiency, and excluding unreliable evidence easily outweigh Petitioner's interest in its admission. Thus, the trial court's decision to exclude the blue blanket was not constitutional error.

### D. ACCUMULATION OF ERRORS

■■■ Finally, Petitioner also contends his writ should be granted because of the accu-

mulation of errors at his trial. Technically, this is not an independent ground for relief because a habeas petitioner has no grounds for relief where no single alleged error is of sufficient magnitude to constitute a trial error of constitutional magnitude. *See, e.g., Rupe v. Wood,* 93 F.3d 1434, 1445 (9th Cir. 1996). Rather, this is a means of addressing situations where a trial is infected by multiple "trial errors" of constitutional magnitude that are not sufficiently prejudicial individually to warrant relief. If, in such situations, the combined impact of these errors is such that they had a substantial and injurious effect on the jury's verdict, then relief may be granted even though no individual violation had such an impact.[16] *See United States v. Frederick,* 78 F.3d 1370, 1381 (9th Cir. 1996).

██ Here, accumulation of errors constitutes an alternative basis for the Court's decision that Petitioner should be granted a writ of habeas corpus. As already discussed, the trial court's decisions to admit the taped statements of the two Flotas and McKee violated Petitioner's rights under the Confrontation Clause. Only one of these violations—the admission of his codefendants' statements—was sufficiently prejudicial to warrant granting relief. The admission of George Flota's statement was also prejudicial to Petitioner, but that prejudice was of a more limited nature that does not justify granting Petitioner's writ. It necessarily follows, therefore, that considered together, these two independent Confrontation Clause violations also had a substantial and injurious effect or influence on the jury's verdict.

### III. PETITIONER'S MOTIONS TO RECONSIDER SUMMARY JUDGMENT

Petitioner also requests that the Court reconsider its first summary judgment order.

That order granted summary judgment to Respondent on 14 of Petitioner's 18 grounds, principally because Petitioner had procedurally defaulted his right to bring many of those claims and had not demonstrated that he satisfied either the "cause and prejudice" or "fundamental miscarriage of justice" exceptions to the procedural default doctrine. *See* Ct. Rec. 91.

██ Because neither of Petitioner's reconsideration motions was made within the ten day period mandated by Fed.R.Civ.P. 59, these motions are construed as having been brought pursuant to Rule 60. *See Straw v. Bowen,* 866 F.2d 1167, 1171 (9th Cir.1989). The only grounds for reconsideration pursuant to Rule 60(b) grounds that are potentially relevant to Petitioner's claims are Rule 60(b)(1)'s authorization of relief from judgments based on "mistake, inadvertence, surprise, or excusable neglect," and Rule 60(b)(6)'s authorization of reconsideration for "any other reason justifying relief from the operation of judgment." In order to obtain relief from judgment under Rule 60(b)(1), the movant must demonstrate that the court committed a specific error. *Straw,* 866 F.2d at 1172. Under Rule 60(b)(6), the movant must demonstrate the existence of "extraordinary circumstances" in order to prevail. *Straw,* 866 F.2d at 1172.

Neither of these circumstances is met here. For the most part, Petitioner's contentions simply restate arguments that were rejected in the Court's first summary judgment order. His principal contention is that cause exists for his default of most of these claims because he was pro se and was unaware of a change in the law that imposed the statute of limitations that was the basis of his default of his state Personal Restraint Petition ("PRP"). This argument was reject-

---

**16.** The Court rejects Petitioner's contention that it should also consider any prejudice he suffered as a result of the grounds for relief that were defaulted in state court. By its very nature, the cumulative error doctrine requires there first be a determination that an error of constitutional magnitude has occurred. Absent the applicability of one of its exceptions, the procedural default doctrine precludes courts from reaching the question of whether such an error occurred. To reach the merits of defaulted claims as Petitioner suggests would be to ignore the values served by the adequate and independent state law rationale underlying the procedural default doctrine. Because the Court is precluded from determining whether any of Petitioner's defaulted grounds for relief constitute error, it is necessarily precluded from determining whether any prejudice resulted from those alleged errors. *Cf. United States v. Necoechea,* 986 F.2d 1273, 1282 (9th Cir.1993) (on direct review, appellate court is limited to reviewing plain errors and errors preserved for appeal).

ed on the merits in the Court's first summary judgment order. Although Petitioner has since supplemented the record, the Court remains convinced that Petitioner has failed to demonstrate that the State of Washington's efforts to notify prisoners like him of the changed limitations period was so inadequate that this constitutes a sufficient excuse for his default.

Petitioner's additional arguments are similarly unavailing. Petitioner's contention that he did not understand the potential ramifications of his failure to present all of his issues to Washington's supreme court on direct appeal is the type of inadvertent error that would swallow the procedural default doctrine whole if it were recognized as a valid cause for default. Moreover, Petitioner was represented by counsel on appeal and has not demonstrated that this representation was constitutionally deficient. *See Smith v. Murray,* 477 U.S. 527, 533–34, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (intentional, strategic decisions by Petitioner or counsel do not constitute a factor external to his defense); *See Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2678, 91 L.Ed.2d 397 (1986). (inadvertent error also does not constitute cause because Petitioner "bear[s] the risk of attorney error that results in a procedural default" unless error amounts to constitutionally ineffective assistance of counsel).

Also without merit is Petitioner's additional argument that he lacked incentive to reraise some of these arguments because they were not addressed by Washington's court of appeals after he raised them in a pro se brief.[17] While there is a "futility" exception to the default doctrine, that exception is narrow and Petitioner has not made a sufficient showing that reraising these arguments would have been futile. *See Noltie v. Peterson,* 9 F.3d 802, 805–06 (1993). Also rejected is Petitioner's argument that his claims were more properly brought on collateral review because they required factual development outside of the record. The authority on

which Petitioner relies for this proposition, *United States v. Molina,* 934 F.2d 1440, 1446 (9th Cir.1991), involved a federal conviction challenged in a § 2255 motion, a situation that has little or no applicability to the underlying independent and adequate state law rationale for the procedural default doctrine. Moreover, if accepted, this contention would excuse only Petitioner's failure to present these arguments on direct appeal, not his subsequent failure to present these arguments to Washington's supreme court in a timely manner on collateral review.[18]

Finally, Petitioner now contends that the "fundamental miscarriage of justice" exception excuses his default. This exception requires a colorable showing of actual innocence. *Schlup v. Delo,* 513 U.S. 298, 325–26, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Coley v. Gonzales,* 55 F.3d 1385, 1387–88 (9th Cir.1995). Petitioner's contentions go almost exclusively to the question of whether he was given a constitutionally sufficient trial. If allegations such as these were enough, virtually all habeas petitioners would qualify for this narrow exception to the procedural default doctrine. To be credible, a claim of actual innocence must be supported by new, reliable evidence that was not considered at trial. *Schlup,* 513 U.S. at 324. Petitioner has made no such showing here.

### IV. MOTION TO AMEND HABEAS PETITION

Petitioner also seeks to amend his petition to add a claim for ineffective assistance of counsel because his counsel was not present when his jury rendered its verdict. Because Petitioner's original petition is granted, this issue is moot. Were the Court to reach this motion on the merits, however, it would be inclined to deny the motion because this claim has been procedurally defaulted.[19]

A claim is procedurally defaulted if it has never been presented to the state's highest court and that court would now find the claim to be procedurally barred. *Cole-*

---

17. Although many of these arguments were raised in the context of Petitioner's motion to amend his petition, they are addressed here because they are equally applicable to his motion for reconsideration.

18. The Court also rejects Petitioner's contentions that the plain error doctrine excuses his default and that the initial summary judgment order was based on impermissible considerations.

19. Respondent also claims that this ground for relief is not "exhausted." This is true in the

man v. Thompson, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). *Noltie v. Peterson*, 9 F.3d 802, 805 (9th Cir.1993). Petitioner acknowledges that this is the case with respect to this claim, but contends that his default should be excused because there were legally sufficient causes for his default and, in the alternative, because he is innocent.

For the most part, Petitioner's supporting arguments are the same arguments that have been rejected with respect to his motions for reconsideration. Petitioner's additional arguments unique to this motion are equally unavailing. Petitioner's contention that his presentation of an "accumulation of trial errors" claim to Washington's supreme court on direct review encompasses this claim fails to satisfy the stringent identification of claim requirements established by the Supreme Court. *See Duncan v. Henry*, 513 U.S. 364, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995); *Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). *See also Johnson v. Zenon*, 88 F.3d 828, 830–831 (9th Cir.1996).

Also unconvincing is Petitioner's argument that he could not have been expected to raise this argument on appeal because his trial counsel was part of his appellate team. *See, e.g., Hopkinson v. Shillinger*, 866 F.2d 1185, 1203–04 n. 12 (10th Cir.1989). Whatever merit this argument may have in other contexts, it is not borne out by the facts of this case. First, Petitioner's trial counsel was not his lead appellate counsel and appears to have participated principally to provide assistance and continuity for his lead appellate counsel. Second, the conditions surrounding the absence of Petitioner's counsel from the reading of the jury verdict do not tend to suggest that this absence reflected poorly on

counsel.[20] There is little reason, therefore, to speculate that trial counsel's presence on Petitioner's appellate team "chilled" that team's ability to present this claim on direct appeal.

In sum, Petitioner's motion to amend his petition shall not be granted because there is no need to amend his original petition. Were the Court to reach this motion on the merits, however, it would be inclined to deny the motion because the amendment sought would be futile.

## V. CONCLUSION

Petitioner's trial was infected with constitutional errors—violations of his right to confront his accusers—that undermined the legitimacy of his conviction. Thus, his petition for a writ of habeas is meritorious and he must be given a new trial or released from custody. On all of Petitioner's other claims, however, summary judgment has been granted to Respondent because those claims either lack merit or have been procedurally defaulted. Additionally, Petitioner's motion to amend need not be considered because it is moot in light of the resolution of the claims stated in his original petition.

Accordingly, IT IS HEREBY ORDERED:

1. Petitioner's Motion for Summary Judgment (**Ct.Rec.141**) and Respondent's Motion for Summary Judgment (**Ct.Rec.120**) are both **GRANTED in part** and **DENIED in part**. Petitioner's motion is granted, and Respondent's motion is denied, as to the first and eighteenth grounds for relief stated in his petition. Respondent's motion is granted, and Petitioner's denied, as to the second and fifth grounds for relief stated in Petitioner's petition.

2. Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Per-

---

sense that this claim was never presented on the merits to the Washington Supreme Court. However, exhaustion for purposes of federal habeas relief exists if Petitioner has no "right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c). *See also Coleman v. Thompson*, 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion"); *Engle v. Isaac*, 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) (§ 2254(b) refers only to

"remedies still available at the time of the federal petition"). Thus, if Petitioner has defaulted this claim, it is exhausted.

**20.** The venue of Petitioner's trial was changed to Seattle from Grant County, which is located in central Washington, approximately a three-hour drive east of Seattle. Because the jury deliberations were extensive, counsel returned to his office in Grant County. He was not advised by the trial court that a verdict had been reached until after the verdict was rendered.

son in State Custody (**Ct.Rec.2**) is **GRANTED** and Petitioner is awarded a writ of habeas corpus pertaining to his conviction in the matter of *State of Washington v. Stephen C. Whelchel,* Grant County cause number 86–1–00197–5. The State of Washington shall grant Petitioner a new trial or release him from custody. If a particular order or form is required to execute this order, Respondent shall provide a copy to the Court immediately upon receipt of this order.

3. Petitioner's motions to reconsider summary judgment (**Ct.Rec.108, 141**) are **DENIED.**

4. Petitioner's Motion to Amend Habeas Petition (**Ct.Rec.146**) is **DENIED** as moot.

5. Petitioner's Motion for Extension of Page Limit (**Ct Rec. 144**) is **GRANTED,** and his Motion for Expedited Hearing (**Ct.Rec.152**) is **DENIED.**

**IT IS SO ORDERED.** The District Court Executive is directed to enter this order and to provide copies to counsel.