Stephen WHELCHEL, Petitioner–
Appellee,

v.

State of WASHINGTON, Respondent–
Appellant.

Tana Wood, Plaintiff–Appellee–
Cross–Appellant,

v.

Stephen C. Whelchel, Defendant–
Appellant–Cross–Appellee.

Nos. 98–35052, 98–35132.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 11, 2000

Filed Nov. 29, 2000

---

John J. Samson (argued), Thomas J. Young, Erin Marie Moore, Office of the Attorney General, Olympia, Washington, for the defendant-appellant/cross-appellee.

Nancy D. Tenney (argued), Federal Defenders of Eastern Washington and Idaho, Spokane, Washington, for the plaintiff-appellee/cross-appellant.

Before: SCHROEDER, BEEZER, and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

The State of Washington ("Washington") appeals the district court's grant of habeas corpus relief to Stephen Whelchel ("Whelchel") who was convicted in state court of first-degree murder. Whelchel claims that several constitutional errors made during his trial mandate relief: (1) the violation of his Confrontation Clause rights by the admission of tape-recorded statements made by a pair of unavailable co-defendants implicating him in the murder; (2) the violation of his Confrontation Clause rights by the admission of a videotaped deposition of a witness challenging Whelchel's alibi where the prosecution made no showing that the witness was legally unavailable to testify at trial; (3) the violation of his due process rights by the failure to admit certain evidence found at the crime scene sometime after the murder; and (4) cumulative error preventing his receiving a fair trial. The district court granted relief on grounds (1) and (4), but denied it as to the remaining grounds. Washington appeals the grant as to grounds (1) and (4); Whelchel cross-appeals the denial of the petition on the remaining grounds.

Because we agree that Whelchel's Confrontation Clause rights were violated by the admission of the tape-recorded statements of his co-defendants, but not otherwise, we affirm.

Background Facts & Procedural History

In the early morning of September 27, 1986, Margo McKee ("Margo"), a pregnant woman, was stabbed and beaten to death in Moses Lake, Washington. When Margo's body was found three weeks later, the police investigation soon focused on Margo's husband, Jerry McKee ("McKee"), and four of the couple's associates: Stephen Whelchel ("Whelchel"); Jeffrey Flota ("Flota"); Beth Massey ("Massey"), Whelchel's girlfriend; and Nancy Hughes ("Hughes"), Flota's girlfriend. All but Whelchel confessed to participating in the murder. In exchange for being prosecuted as juveniles, Massey and Hughes pleaded guilty and agreed to testify at the trials of McKee, Flota, and Whelchel. In January 1987, McKee and Flota were convicted of first-degree murder in a joint trial.

Whelchel's case proceeded to trial in May, 1987. A principal part of the state's case was three tape-recorded statements, two from McKee and one from Flota, each given to Grant County Sheriff's officers. Additionally, the state relied upon a videotaped deposition of George Flota, the father of Jeffrey Flota. The deposition was taken under oath, in front of the trial judge, in Whelchel's presence and with the opportunity for cross-examination by Whelchel's counsel. During the defense case, the trial judge denied Whelchel's request to introduce into evidence a bloodstained blanket found at the crime scene quite some time after the murder. After four days of jury deliberation, Whelchel was found guilty of first-degree murder on June 1, 1987. He was sentenced to 333 months confinement.

The Washington Court of Appeals affirmed Whelchel's conviction in an unpublished decision. The Court of Appeals held that the admission of the tape-recorded statements by McKee and Flota was not error because McKee and Flota were not legally available to testify at the trial and the statements bore a sufficient showing of trustworthiness. Whelchel then appealed to the Washington Supreme Court, which granted review solely on the issue of whether the admission of the tape-recorded statements by McKee and Flota violated Whelchel's rights under the Confrontation Clause of the Sixth Amendment. Although the Washington Supreme Court affirmed Whelchel's conviction, it held that the admission of the tape recordings was

constitutional error because the statements did not fall under any firmly established hearsay exception nor did they bear the "adequate indicia of reliability needed to satisfy confrontation clause concerns." *State v. Whelchel,* 115 Wash.2d 708, 801 P.2d 948, 951 (Wash.1990) (internal quotation marks omitted). The Washington Supreme Court nonetheless held this error to be harmless "because of the overwhelming untainted evidence of the defendant's guilt presented at the trial." *Id.* Justice Utter, joined by Justice Smith, dissented, stating that "[i]t is reasonably possible, indeed fairly likely, that the jurors convicted only because the statements improperly admitted into evidence took away reasonable doubts which the contradictory statements in the rest of the evidence may have left in their minds." *Id.* at 960 (Utter, J., dissenting). Whelchel subsequently exhausted his state remedies by submitting a personal restraint petition to the Washington Court of Appeals and seeking review of its denial in the Washington Supreme Court. *See Lord v. Wood,* 184 F.3d 1083, 1084 (9th Cir.1999), *cert. denied,* — U.S. ——, 120 S.Ct. 1262, 146 L.Ed.2d 118 (2000). The Washington Supreme Court denied review of the appellate court's dismissal of Whelchel's petition.

Whelchel then filed the present habeas corpus petition in district court, presenting eighteen grounds for relief. The state moved for summary judgment, claiming that Whelchel was procedurally barred from asserting many of his claims and that the remaining grounds lacked merit. Whelchel cross-moved for summary judgment requesting that the writ be granted on the basis of five of the grounds. The district court granted and denied portions of the state's motion and Whelchel's cross-motion, and ultimately ordered the parties to submit additional briefing on the Confrontation Clause claims arising from: (1) the admission of the tape-recorded statements of McKee and Flota, (2) the videotaped deposition of George Flota, (3) the refusal to admit the bloodstained blanket, and (4) the cumulative error claim.

After receiving the additional briefing, the district court granted habeas relief on the first and last claims and denied relief on all other grounds. We have jurisdiction under 28 U.S.C. §§ 1291, 2253.[1]

## Standard of Review

Whelchel filed his habeas petition on November 9, 1995, before the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1217. Our substantive review of the petition is, therefore, governed by pre-AEDPA standards. *See Jeffries v. Wood,* 103 F.3d 827, 827 (9th Cir.1996) (en banc order). The district court's decision to grant or deny a 28 U.S.C. § 2254 habeas petition is reviewed *de novo, see McNab v. Kok,* 170

---

1. In *Slack v. McDaniel,* 529 U.S. 473, ——, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000), the Supreme Court held that the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), regarding the issuance of a certificate of appealability ("COA") as a predicate to review in the court of appeals apply to all cases in which the notice of appeal was filed after AEDPA's effective date, April 24, 1996. Whelchel filed his notice of appeal on December 30, 1997 and the district court granted a Certificate of Probable Cause as to both grounds of the appeal on January 28, 1998. In this situation, Whelchel's notice of appeal is treated as an application for a COA. *See Schell v. Witek,* 218 F.3d 1017, 1021 n. 4 (9th Cir. 2000) (en banc). AEDPA permits a court to issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this "modest standard," the petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Lambright v. Stewart,* 220 F.3d 1022, 1024–25 (9th Cir.2000) (citations and internal quotation marks omitted). It is clear that Whelchel's appeal meets this standard and Washington does not contend otherwise. Accordingly, we grant the COA and exercise jurisdiction over all issues presented in this appeal. *See Schell,* 218 F.3d at 1021 n. 4.

F.3d 1246, 1247 (9th Cir.1999) (per curiam), as is the district court's grant of summary judgment, *see Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.), *cert. denied,* 528 U.S. 952, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999). Alleged violations of the Confrontation Clause are reviewed *de novo. See Swan v. Peterson,* 6 F.3d 1373, 1379 (9th Cir.1993).

### Analysis

I. Admission of McKee and Flota Tape-recorded Statements

A. Background

Two tape-recordings of McKee were admitted into evidence. Both recordings were done with McKee's knowledge and consent after he had been given the *Miranda* warning and waived his *Miranda* rights. The first recording took place on October 16, 1986, when McKee went to the Moses Lake Police Department to file a missing persons report on his wife. After approximately forty minutes of questioning (not on tape), McKee admitted to being present when his wife was murdered. McKee then proceeded to answer questions about the night of his wife's murder and his role.

According to McKee, Whelchel told McKee that he wanted to kill Margo and Whelchel organized events leading up to the murder. McKee also stated that Whelchel struck Margo on the head with a wooden table leg and then stabbed her. McKee said that he ran away from the scene with Hughes after the first blow and stayed at the top of a hill for about ninety minutes. McKee returned to the scene after Massey came up the hill and told him that Whelchel and Flota were "taking care of it." McKee repeatedly denied any involvement in the actual killing, even when police used the ruse that they "knew" McKee struck Margo with a rock.

The next day, the police interrogated McKee again, recording the session. McKee again stated that Whelchel did the actual killing. This time, however, McKee stated that he saw Whelchel hit Margo at least ten times before he left to go up the hill. McKee also admitted more serious involvement. In response to the question, "Why was [Margo] killed?" McKee answered, "Cause I wanted to get [Margo] out of my life, instead of getting a divorce I wanted. Steve [Whelchel] had that done." McKee said that he never asked Whelchel to murder his wife, but told him "just don't involve me" when Whelchel said he would kill her.

The tape-recorded interrogation of Flota was conducted on October 16, 1986, following his arrest. Flota had knowledge of, and consented to, the recording after being given a *Miranda* warning and waiving his *Miranda* rights. Flota also stated that Whelchel was the person who wanted to murder Margo and that it was Whelchel who did the actual killing. Flota admitted to holding Margo in a choke hold for about five minutes but claimed that Margo was still breathing and talking after he released her. Flota said that he choked Margo at Whelchel's insistence because he was afraid that Whelchel would hurt or kill him if he did not comply with Whelchel's instructions. Like McKee, Flota stated that Whelchel stabbed Margo.

At the trial, the jury heard edited versions of McKee's and Flota's tape-recorded statements. The edited versions solely omitted references to satanism and Margo's pregnancy. Whelchel's lawyer, who had objected to the introduction of the tapes before trial, renewed his objections before each tape was played.

B. Confrontation Clause Jurisprudence

█ The Confrontation Clause of the Sixth Amendment, which applies to the states through its incorporation in the Due Process Clause of the Fourteenth Amendment, *see Christian v. Rhode,* 41 F.3d 461, 465 n. 3 (9th Cir.1994), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... be confronted with witnesses against him." U.S. Const. amend. VI. "[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-ex-

amination." *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (internal quotations omitted); *see also LaJoie v. Thompson,* 217 F.3d 663, 668 (9th Cir.2000) (citing *Van Arsdall* ).

 The Confrontation Clause "requires that in order to introduce relevant statements at trial, state prosecutors either produce the declarants of those statements as witnesses at trial or demonstrate their unavailability." *Bains v. Cambra,* 204 F.3d 964, 973 (9th Cir.2000) (citing *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). If unavailability has been demonstrated, then the proffered statements, which are by definition hearsay, must be shown to bear an "adequate indicia of reliability." *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Bains,* 204 F.3d at 973. This "indicia of reliability" may be shown in two different ways. First, if the statements fall "within a firmly rooted hearsay exception," reliability is established. *See Idaho v. Wright,* 497 U.S. 805, 815, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *see also Bains,* 204 F.3d at 973. In cases where the statements do not fall within such a hearsay rule exception, "the evidence must be excluded ... absent a showing of 'particularized guarantees of trustworthiness.'" *Wright,* 497 U.S. at 815, 110 S.Ct. 3139 (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531).

 The particularized guarantees of trustworthiness "must be shown from the totality of the circumstances...." *Id.* at 819, 110 S.Ct. 3139. The "relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* There is no mechanical test for determining reliability nor a prescribed list of reliability elements, *see Barker v. Morris,* 761 F.2d 1396, 1400–03 (9th Cir. 1985), and "courts have considerable leeway in their consideration of appropriate factors," *Wright,* 497 U.S. at 822, 110 S.Ct. 3139. The reliability of the out-of-court statements cannot be established "by bootstrapping on the trustworthiness of other evidence." *Id.* at 823, 110 S.Ct. 3139.

### C. Confrontation Clause Analysis

 Both Flota and McKee invoked their Fifth Amendment privilege against self-incrimination and refused to testify at Whelchel's trial. The district court correctly held that under such circumstances both declarants were legally unavailable. *See California v. Green,* 399 U.S. 149, 168 n. 17, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *see also Lee v. Illinois,* 476 U.S. 530, 549, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (Blackmun, J., dissenting); *United States v. McKinney,* 707 F.2d 381, 383 n. 1 (9th Cir.1983).

 The state concedes that the McKee and Flota statements do not fall under any firmly rooted hearsay exception. Therefore, in order to be admissible, the statements must bear particularized guarantees of trustworthiness. Both the Washington Supreme Court and the district court found that the tape-recordings do not meet this requirement. We agree with their analysis.

In general, the Washington Supreme Court and the district court relied on the principle that self-inculpatory statements by co-defendants that also inculpate the defendant at issue are "presumptively unreliable." *Lee,* 476 U.S. at 539, 106 S.Ct. 2056; *see also United States v. Sarmiento–Perez,* 633 F.2d 1092, 1094 (5th Cir. 1981) ("[S]tatements of a codefendant have traditionally been viewed with special suspicion.") (quoting *Bruton v. United States,* 391 U.S. 123, 141–42, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting)). The United States Supreme Court explained the basis for this suspicion as arising from a co-defendant's "strong motivation to implicate the defendant and to exonerate himself...." *Lee,* 476 U.S. at 541, 106 S.Ct. 2056 (quoting *Bruton v. United States,* 391 U.S. 123, 141, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting)).

The Flota and McKee recordings are textbook examples of co-defendant statements that are presumptively unreliable. While both Flota and McKee admitted to being at the murder scene and being aware that Margo was to be killed, each repeatedly minimized his own role. McKee disclaimed any responsibility for the planning and the actual murder, while Flota admitted to choking Margo but claimed that his acts did not kill her. As the Washington Supreme Court observed, by placing exclusive blame for the planning and performance of the murder on their co-defendant Whelchel, McKee and Flota were clearly attempting to "foist blame" on Whelchel while "minimizing" their responsibility. *Whelchel*, 801 P.2d at 954 (quoting D. Louisell & C. Mueller, *Federal Evidence* § 489, at 1411 (1980)).

The state argues that the presumption of unreliability is overcome by three factors: (1) the statements were contrary to the penal interests of McKee and Flota; (2) the state trial court found that both McKee and Flota made the statements in a "mental attitude of wanting to clear their chest [sic]"; (3) the statements were made voluntarily after both men had been advised of, and waived, their *Miranda* rights. These arguments are unpersuasive.

■ As mentioned, the presumption against the reliability of a co-defendant's statement exists notwithstanding the fact that the co-defendant's statement may generally be against his penal interest. The transcripts of the recordings clearly indicate that McKee and Flota, who both knew that the police suspected them of committing the murder when their interrogations were being recorded, were attempting to exculpate themselves.

■ As for the state's second argument, the trial court's statement is not a finding of fact, but an opinion expressed by the trial judge. Since the trial judge had no opportunity to personally observe McKee or Flota, the statement is also not a credibility determination. Moreover, trustworthiness determinations under a Confrontation Clause analysis are re-

viewed *de novo*. *See Webb v. Lewis*, 44 F.3d 1387, 1392 (9th Cir.1994) (reviewing the reliability of videotaped testimony and holding that "on the ultimate determination of trustworthiness we act de novo.").

With regard to the third factor, it is highly questionable whether McKee and Flota made their statements voluntarily. To be sure, their statements were not coerced or made under duress so as to implicate Fifth Amendment concerns. However, McKee's second statement and Flota's statement were made after each had been placed under arrest for murder. McKee's first statement was made after it became clear to him that the police did not believe his missing persons report and suspected him of foul play. These scenarios are much different than a confession made by an individual not yet suspected of a crime. As the district court noted, that some of McKee's and Flota's statements were made after they were told that they had been implicated in the crime by others, enhances the level of duress and undermines reliability. *Whelchel v. Wood*, 996 F.Supp. 1019, 1027–28 (E.D.Wash. 1997) (citing *Lee*, 476 U.S. at 544, 106 S.Ct. 2056).

Adding to the lack of reliability of these statements is that they were not taken under oath or subject to cross-examination. The opportunity to cross-examine adverse witnesses is a critical component of Confrontation Clause analysis. *See Van Arsdall*, 475 U.S. at 678–79, 106 S.Ct. 1431; *see also LaJoie*, 217 F.3d at 668. Here there was none.

Accordingly, we agree with the district court and the Supreme Court of Washington that it was a violation of the Confrontation Clause to admit the tape-recorded statements of McKee and Flota.

### D. Harmless Error

#### 1. Harmless Error Jurisprudence

■ A Confrontation Clause violation is subject to harmless error analysis. *See United States v. Bowman*, 215 F.3d

951, 961 (9th Cir.2000). "In the context of habeas petitions, the standard of review is whether a given error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Christian v. Rhode,* 41 F.3d 461, 468 (9th Cir.1994) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). Under this standard of review:

> [T]he question is, not were [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision.... The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.

*Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

 We agree with the district court that the Confrontation Clause error was not harmless under this standard. In its analysis, the district court considered an illustrative set of factors to be considered when assessing the harmlessness of a Confrontation Clause violation as propagated by the Supreme Court in *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). These factors include the importance of the testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case. *Id. Van Arsdall,* a direct rather than habeas corpus appeal, was subject to the "harmless beyond a reasonable doubt" standard. Nevertheless, there is nothing in the opinion or logic of *Van Arsdall* that limits the use of these factors to direct review. *See, e.g., Latine v. Mann,* 25 F.3d 1162, 1167–68 (2d Cir.1994) (applying the *Van Arsdall* factors under a *Brecht* standard on habeas corpus review). Moreover, the district court merely used the *Van Arsdall* factors as guidance and cited what it considered to be analogous factors articulated in *Brecht. Whelchel,* 996 F.Supp. at 1031. The *Van Arsdall* factors were properly considered and we use them as guidance in our analysis as well.

### 2. Harmless Error Analysis

#### a. Evidentiary Basis of the Case Against Whelchel

The district court correctly held that the Confrontation Clause error had a substantial and injurious effect or influence on the jury. The case against Whelchel consisted of three types of evidence: (1) physical evidence; (2) the testimony of third parties who either heard Whelchel make incriminating statements about the murder or placed him near the scene; and (3) the testimony of the four co-defendants.

##### (1) Physical Evidence

The physical evidence against Whelchel is scant. No blood was found on Whelchel's clothes and though two wooden table legs were found, neither were ever conclusively determined to have been the murder weapon. Additionally, the prosecution could not establish that a knife found in Whelchel's car, allegedly used to stab Margo, belonged to Whelchel. Testimony at trial suggested that the knife used in the stabbing was very similar to one bought by McKee; indeed McKee's were the only fingerprints found on this knife. There was also testimony that McKee and Flota tried to sell the knife used to kill Margo sometime between the murder and their arrest.

The only piece of physical evidence linking Whelchel to the murder was Margo's purse, which was found in Whelchel's car. The presence of the purse in Whelchel's car, however, comports with Whelchel's testimony that he helped Flota and McKee cover up the crime after the fact, in part by bringing a box full of items containing Flota's clothes to his house to wash blood from them. According to Whelchel's testimony, he was stopped by police when he

was returning the clothes and other items in the box to Flota.

### (2) Third Party Testimony

Whelchel argues that the testimony of his alleged confessions to third parties was also not overwhelmingly powerful. The prosecution presented seven different witnesses to whom Whelchel allegedly admitted committing the murder or said that he planned to do so. Turina Liebrecht testified that Whelchel said, "We killed [Margo]." Audrey McClelland also testified that Whelchel told her that "we killed" Margo. Whelchel contends that these statements are consistent with his story that he was involved in the conspiracy to cover up the murder after the fact.

Likewise, Whelchel argues that Tracy Weaver's testimony only implicated Whelchel in the conspiracy. Weaver testified that Whelchel had "come and said [that] him and his friends killed Jerry's [McKee's] wife [Margo]." Mary Mosley's testimony was to the same effect. Mosley testified that she heard Whelchel, referring to Margo, say, "We're going to kill her."

Steve Kirkendoll testified that Whelchel told him, "Margo was going to be killed," and, "he [Whelchel] wanted her killed." On cross examination, Kirkendoll stated that Whelchel never told him that he was going to kill Margo himself. Kirkendoll also testified that he had previously been injured by Whelchel; Kirkendoll characterized it as a sucker punch to the head, which led to a three-day hospital stay. Obviously, Kirkendoll could have been viewed by the jury as having grounds for a grudge against Whelchel.

Two people testified that Whelchel actually said he committed a murder. Douglas Crozier testified that Whelchel said he had killed someone, though Margo's name was not mentioned. According to Crozier, Whelchel told him "he had killed somebody and that he would do it again if a friend asked [him]. . . ." On cross-examination, Crozier admitted to animosity towards Whelchel. David Joy, a former cell mate of both Whelchel and McKee, testified that Whelchel told him that he killed Margo. This testimony was substantially the same as Joy's testimony earlier at McKee's trial. On cross-examination, Joy said that he had testified at McKee's trial at McKee's request after meeting McKee while incarcerated.

### (3) Massey and Hughes Testimony

The testimony of co-defendant Hughes, though consistent, was not without difficulties for the prosecution, most importantly because Hughes never actually saw Whelchel hit Margo. Hughes testified that just before the attack began, she turned her back to Whelchel. While turned, she "heard a crack like when you hit a baseball." When Hughes did turn back around, "Margo was on her knees and Steve [Whelchel] was standing behind her." Hughes testified that she then ran away and that later, when she started to return to the scene, Whelchel told her to "get the hell out of here."

Hughes testified that she heard Margo pleading with Whelchel to stop. On cross-examination, however, it was revealed that in an earlier statement Hughes said that she held her hands over her ears after Margo was first struck and could not hear any words or specific statements. Hughes also testified that Whelchel told her he had clubbed and stabbed Margo.

Unlike Hughes, Massey testified that she actually saw Whelchel kill Margo. Massey's testimony was substantially the same as Hughes's, except that Massey testified that she watched Whelchel hit Margo and did not flee the scene. Massey admitted that she hit Margo with a table leg herself.

The jury heard testimony which could undermine the credibility of Hughes and Massey. First, Massey had broken up with Whelchel subsequent to the murder but before she agreed to testify and Whelchel, in his role in the after the fact cover-up, allegedly threatened to turn in Massey and the rest of the group. Moreover,

Hughes and Massey testified against Whelchel as part of a plea agreement in which they were prosecuted as juveniles in exchange for their testimony, giving them an incentive to minimize their roles in the murder. This incentive is especially strong in Massey's case, as she admitted striking Margo but claimed that her blows were inflicted post-mortem.

### b. Impact of McKee and Flota Testimony

The prosecution emphasized the McKee and Flota testimony during its closing argument, referring to "four eyewitnesses." In its closing, the prosecution referred to the tape-recorded statements several times, even quoting from their transcripts. As the United States Supreme Court has noted, "Not only are the incriminations [of co-defendants] devastating to the defendant but their credibility is inevitably suspect...." *Bruton v. United States*, 391 U.S. 123, 136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). McKee's and Flota's statements, especially as they dovetailed with the testimony of Hughes and Massey, were clearly prejudicial to Whelchel. Each of the four tended to corroborate the others, thereby bolstering the credibility of each.

■ While corroborative evidence may, as a general rule, make the wrongful introduction of other evidence harmless, this concept has no application where: (1) there was a reason for the jury to doubt the only eyewitness testimony; (2) the third party testimony was not exceptionally strong; and (3) the physical evidence connecting the accused to the crime was limited and explained by the suspect's claimed role of accessory after the fact.

Without the McKee and Flota statements, the prosecution presented the jury only one true eyewitness, Massey, who had two possible reasons to testify falsely— first, to shift blame when plea bargaining for a lighter sentence, especially since Massey admitted striking Margo, and second, to punish an ex-boyfriend who threatened to turn the murderers in to the police. The McKee and Flota statements

contained important facts not testified to by either Hughes or Massey. For example, McKee and Flota recounted a game they allegedly played with Whelchel to determine who would strike the fatal blows and said that Whelchel decided to kill Margo even though he was not selected through the game. McKee and Flota also added that Whelchel assisted in the disposal of Margo's body after the murder.

McKee's and Flota's tape-recorded statements were not wholly cumulative of other evidence. Since co-defendant testimony is inherently suspect, the corroborative value of the McKee and Flota statements *vis a vis* the Massey and Hughes testimony was potentially significant to the jury's verdict. Moreover, this was not a case where the physical evidence or the third party testimony overwhelmingly pointed to Whelchel's guilt. Therefore, we cannot hold that the constitutional error in this case was harmless.

### II. Videotaped Deposition of George Flota

The prosecution introduced a videotaped deposition of George Flota, Flota's father. The district court held that the admission of the videotape violated the Confrontation Clause but that the error was harmless. We agree with the district court.

### A. Confrontation Clause Analysis

■ Unlike the tape-recorded statements of McKee and Flota, the issue here is not the reliability of the testimony, but whether George Flota was legally unavailable for purposes of the Confrontation Clause analysis. In *White v. Illinois*, 502 U.S. 346, 354, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), the Supreme Court held that the "unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding." The state argues that George Flota's deposition was not a "judicial proceeding." This argument fails.

During the deposition, Whelchel was present and represented by counsel who had the opportunity to cross-examine George Flota and object to questions. Further, this deposition was presided over by the trial judge. Thus, the deposition had all the trappings of testimony in court and was, therefore, a "proceeding wherein judicial action [was] invoked and taken," *Black's Law Dictionary* 849 (6th ed.1990), and should be considered a "judicial proceeding."

■■■■ The state cites *United States v. Sines,* 761 F.2d 1434 (9th Cir.1985), in support of a second argument, that a videotaped deposition satisfies all the requirements of the Confrontation Clause. This argument is simply wrong. In *Sines* this court stated that all three purposes of the Confrontation Clause—ensuring that a witness will testify under oath, forcing a witness to undergo cross-examination, and permitting a jury to observe the demeanor of a witness—"were fulfilled when [the witness's] videotaped deposition was taken with [the defendant's] attorney present." *Id.* at 1441. This statement was made, however, in response to the defendant's argument that the taking and admission of the deposition violated his Confrontation Clause rights because the defendant could not attend the deposition, which was held in Thailand. The defendant had the opportunity to attend, but declined based on fears that the Thai authorities might have him arrested on pending drug charges.

In *Sines,* the witness to be deposed was clearly unavailable for testimony at the trial and the defendant chose not to attend the deposition. The instant case presents a much different scenario. Here the defendant attended the deposition and his counsel cross-examined the deponent. The question is whether the Confrontation Clause compels the government to show that the witness was unavailable to testify at trial. *Sines* does not address the issue of whether a videotaped deposition relieves the government of this burden.

■■■■ George Flota could not testify because he was being transferred from Washington to Arkansas by his employer and was therefore outside the trial court's jurisdiction. In such circumstances, the state must make a good faith, reasonable effort to secure the attendance of the witness in order to meet the unavailability requirement of the Confrontation Clause. *See Barber v. Page,* 390 U.S. 719, 724–25, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) ("[A] witness is not 'unavailable' for purposes of the foregoing exception to the confrontation clause requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial."). If the state does not make any effort to secure the witness's attendance, the good faith requirement has not been met and the witness is not legally unavailable. *See Christian v. Rhode,* 41 F.3d 461, 467 (9th Cir.1994).

■■■■ In this case, the Washington Court of Appeals found that the state "made no effort to seek [George Flota's] attendance at trial." *See Whelchel,* 996 F.Supp. at 1038. While a state court's decision that a witness is constitutionally unavailable is an evidentiary question that is reviewed *de novo, Dres v. Campoy,* 784 F.2d 996, 998 (9th Cir.1986), the finding of the Washington Court of Appeals concerning the state's efforts to secure George Flota for testimony at trial is "presumed to be correct" under 28 U.S.C. § 2254(d) (1995) (now 28 U.S.C. § 2254(e)(1)). The state pointed to no evidence in the record to rebut that finding.

Accordingly, the introduction of George Flota's videotaped deposition violated Whelchel's rights under the Confrontation Clause. If the state chooses to try Whelchel again, the state can overcome this Confrontation Clause problem simply by making a good faith effort to have George Flota testify at trial. If George Flota is indeed outside the trial court's jurisdiction when this attempt is made, then the state will have satisfied its burden in showing that George Flota is constitutionally unavailable.

## B. Harmless Error Analysis

### 1. Background

■ George Flota testified about Whelchel's whereabouts the mid-morning to afternoon of the day after the murder. Whelchel testified that he left the group, at that time five people since Margo was still alive, the night of the murder and returned to his parents' home around 1:30 a.m. the morning of September 27th, where he spent the rest of the night. Whelchel testified that he woke up at about 10:30 a.m. Whelchel's mother, father, and sister all testified that he came home the night of the murder, as he said, that they saw him awake the morning of the 27th, and that he left the house sometime in the late afternoon.

The state presented the testimony of four witnesses that undermined Whelchel's alibi. First, Deputy Frank DeTrolio of the Grant County Sheriff's office testified that he went to the Whelchel residence on September 27th at approximately 12:30 p.m. looking for Hughes and Massey, who had been reported as runaways. Deputy DeTrolio testified that he did not see Whelchel at the home during his visit and that when he asked Whelchel's father if his son was at home, the father responded that Whelchel did not live there. While Whelchel's father did not say that Whelchel was not at home, his statement could be seen as conflicting with the father's testimony that Whelchel was around the house until the late afternoon.

Second, Jeanetta Massey, Massey's mother, testified that she went to Whelchel's parents' home on the morning of the 27th to look for her daughter. Jeanetta Massey said that she arrived at the Whelchel home sometime after 11:00 a.m. and sat with Whelchel's mother and father in the kitchen. Jeanetta Massey did not see Whelchel in the house. This testimony does not preclude Whelchel's being elsewhere in the house during her visit, but it could be considered odd that Whelchel's parents would not have asked Whelchel about Massey's whereabouts if he was home, especially since Whelchel was dating Massey at the time.

Third, David Freuh ("Freuh"), the manager of McKee's apartment complex at the time of the murder, also testified for the prosecution. Freuh stated that he saw Whelchel leaving McKee's apartment with the co-defendants at 3:00 a.m. the morning of the 27th. Cross-examination revealed that Freuh was sleepy when he saw the group and that he only saw the backs of the individuals. Moreover, Frueh testified that he only saw five people in the group, not six. Under the prosecution's theory of the case, there should have been six people in the group before Margo's murder: Whelchel, Flota, McKee, Hughes, Massey, and Margo. Finally, Frueh testified that he thought the man he saw was Whelchel because only Whelchel had long, dark hair. In truth, both Whelchel and Flota had long, dark hair at that time.

Fourth, George Flota testified that he went to Whelchel's parents' home on the 27th to look for his son at a time when Whelchel should have been in the house according to the alibi testimony. George Flota testified, as did Deputy DeTrolio and Jeanetta Massey, that he did not see Whelchel in the house and that Whelchel's father gave him no information about where Whelchel was.

### 2. Impact of George Flota Deposition

The district court correctly held that the admission of the videotape of George Flota's deposition was harmless error. George Flota's testimony was almost entirely cumulative of the testimony of Deputy DeTrolio and Jeanetta Massey. Whelchel argues that George Flota testified he saw more of the house than Deputy DeTrolio or Jeanetta Massey. This may be true factually, but the point was not highlighted during the deposition or at trial. Furthermore, the testimony of Jeanetta Massey and Deputy DeTrolio is not subject to a presumption of unreliability since neither witness was a co-defendant. Thus, George Flota's cumulative testimony does

not bolster the credibility of inherently suspect testimony.

Whelchel also argues that George Flota's testimony was prejudicial because Jeanetta Massey's and Deputy DeTrolio's testimony was contradicted at trial by testimony from the Whelchel family that Jeanetta Massey and Deputy DeTrolio actually visited their home on an earlier date. Therefore, Whelchel argues, George Flota's deposition was not cumulative because it is the only uncontroverted evidence disputing Whelchel's alibi. This argument was rebutted by other evidence at trial giving the jury reason to believe Deputy DeTrolio and Jeanetta Massey were correct about the date of their visits. An entry in the police department's dispatch book noted that Deputy DeTrolio called the station on September 27th, indicating he was going to the Whelchel residence. Jeanetta Massey testified that she visited the residence after Deputy DeTrolio had been there and reported back to her. Thus, George Flota's deposition does not stand alone as the only proof of a visit to the Whelchel home on September 27th. Accordingly, George Flota's deposition testimony was merely cumulative and the constitutional error arising from the Confrontation Clause violation was harmless.

### III. Exclusion of the Blanket

Whelchel argues that he was denied the due process right to present his defense when the trial court refused his request to introduce a bloodstained blanket. The blanket was found by investigators several months after the murder, near the crime scene. The blanket had a large bloodstain on it as well as two human hairs. One hair was naturally blond and the other bleached blond. Because of its exposure to the elements for several months, a blood-type analysis could not be performed on the blanket. Thus, it could not even be determined whether the blood on the blanket was human, much less to whom it might have belonged.

Whelchel maintains that the presence of the hairs, which match the general hair colors of McKee and Margo, and the ab-

sence of any hair matching his hair color, support his testimony that he was not present at the murder. Whelchel also argues that the blanket confirms Whelchel's testimony that Flota told him he threw a sheet or blanket over Margo when he choked her. The trial court excluded the blanket on the grounds that it did not have sufficient relevancy to the case.

 "Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir.1987). The state court's decision to exclude certain evidence must be so prejudicial as to jeopardize the defendant's due process rights. *See Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985), *amended on other grounds*, 768 F.2d 1090 (9th Cir.1985). To evaluate whether exclusion of evidence reaches constitutional proportions, this court considers five factors:

(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.

*Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir.1990) (internal citations omitted). This court "must then balance the importance of the evidence against the state interest in exclusion." *Id.*

 The trial court did not err in excluding the blanket. The reliability of the blanket was questionable due to its exposure. The blood could not be identified as human and the hair fibers could not establish anything more than similarity to the hair colors of Margo and McKee. Because the reliability of the evidence was suspect, its probative value to Whelchel's alibi was minimal. Moreover, the absence of Whelchel's hair on the blanket does not neces-

sarily mean that he did not murder Margo, as the blanket may not have been used by Whelchel even if he did participate in the murder.

Though the blanket could be evaluated by the jury, it was not the sole piece of evidence presented by Whelchel in support of his alibi, nor did the blanket present a major part of Whelchel's defense. Accordingly, there was no constitutional error in excluding the blanket and the district court correctly rejected Whelchel's petition for habeas corpus relief on this ground.

IV. Cumulative Error

■ Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudice[d] a defendant." *United States v. Frederick,* 78 F.3d 1370, 1381 (9th Cir.1996); *see also Rupe v. Wood,* 93 F.3d 1434, 1445 (9th Cir.1996). Because we agree with the district court that the admission of the McKee and Flota statements constituted a violation of Whelchel's Confrontation Clause rights and that this violation was not harmless, we need not address the district court's finding of cumulative error.

The district court's issuance of a writ of habeas corpus, on the ground that Whelchel's right of confrontation was violated by the admission of the McKee and Flota statements, is AFFIRMED.